**UNITED STATES of America**

v.

**Marvin MANDEL et al.**

**Crim. No. HM75–0822.**

United States District Court,
D. Maryland.

April 5, 1976.

Jervis S. Finney, U. S. Atty. for the District of Maryland, Barnet D. Skolnik, Ron-

ald S. Liebman and Daniel J. Hurson, Asst. U. S. Attys., Baltimore, Md., for the United States of America.

Arnold M. Weiner, Baltimore, Md., for Marvin Mandel.

William G. Hundley, Washington, D.C., for W. Dale Hess.

Thomas C. Green, Washington, D.C., for Harry W. Rodgers, III.

Michael E. Marr, Baltimore, Md., for William A. Rodgers.

Norman P. Ramsey, Baltimore, Md., for Irvin Kovens.

Joseph A. DePaul, College Park, Md., for Ernest N. Cory, Jr.

## MEMORANDUM AND ORDER

HERBERT F. MURRAY, District Judge.

Defendant Mandel has moved the Court for dismissal of the indictment or in the alternative, for suppression of evidence and other appropriate relief for alleged prosecutorial misconduct. It is claimed that the proceedings in this case have been so "infected" by such misconduct that "the Defendant has been deprived of his constitutional rights to an unbiased, unprejudiced, independent and informed Grand Jury, to due process of law, and to a fair trial." Other defendants in the case have adopted the motion, although none has individually filed any supporting memoranda or affidavits.

Defendant Mandel raises five points in support of his motion. They are as follows:

1. The prosecution abused the subpoena power by employing it for the purpose of conducting private interrogations.

2. The prosecutors violated their duty to present exculpatory evidence to the grand jury.

3. The intimidation of witnesses deprived the defendant of an unbiased grand jury.

4. The prosecutors abused the process of this Court in connection with the indiscriminate issuance of subpoenas duces tecum, amounting to an unlawful search and seizure and an impermissible circumvention of the requirements for subpoenas in connection with tax investigations.

5. The prosecutor's intemperate remarks at the arraignment hearing amounted to professional misconduct.

In its response to defendant's motion, the government asserted that these claims are false or otherwise without merit. It contended there was no abuse of power; that the entire investigation was carefully and thoroughly documented. It offered to supply to the Court for its review every subpoena issued during the investigation, the verbatim transcribed testimony of every witness who appeared before the grand jury, every file, memorandum or other documentation of any step or action taken by any government representative in connection with the case, and if requested, sworn statements from any and every government representative who worked on the investigation, detailing his investigative activities.

In view of the conclusory nature of the allegations in both defendant's motion and the government's response, the Court lacked sufficient factual information to make an informed decision on the claim of prosecutorial misconduct. In order to flesh out the charges made, defense counsel sought an evidentiary hearing. Government counsel, while leaving the matter to the Court's discretion, observed in its response to the motion that the publicity which might be generated by an evidentiary hearing conducted shortly prior to the impaneling of a jury and commencement of trial, might operate to prejudice the rights to a fair trial of other defendants in the case who already were seeking severances and change of venue because of claimed prejudicial publicity. It was suggested instead that any evidentiary hearing be deferred until after the trial.

The Court met with counsel on March 23rd to discuss how the matter should be handled. After hearing counsel, the Court directed that the defense amplify its factual contentions by the filing of supporting affidavits by March 29, 1976 and that the government file opposing affidavits by April 2, 1976. The Court indicated that

upon the filing of the affidavits it would determine whether or not to make them a matter of public record immediately or whether they should be sealed to be opened at an appropriate time after trial. The Court has decided to adopt the latter course, although general references to the content of some of the affidavits will be made in the discussion which follows of the points raised by the motion.

*Did the prosecution abuse the subpoena power by employing it for the purpose of conducting private interrogations?*

The defendant contends that throughout the grand jury investigation, the office of the United States Attorney caused the issuance of grand jury subpoenas, under color of law, for the purpose of compelling persons to appear at the office of the United States Attorney, so as to subject such persons to private interviews by the staff of the United States Attorney, thereby abusing the process of this Court. The affidavits show that approximately five people were subpoenaed for private interviews. Defendant contends that such a use of the subpoena power to secure private interviews in government offices is strongly condemned as an abuse of process, stating:

It is inherently coercive; it provides opportunities for subtle intimidation; and when used to screen witnesses favorable to the defendant, it is manifestly prejudicial. (Memorandum at 8)

The government in its affidavit responds to defendant's contentions as follows:

No one subpoenaed was ever refused the opportunity to appear before the grand jury if that was his preference. No one subpoenaed, to the knowledge of the affiant, was ever knowingly led to believe that he did not have the absolute right to appear before the grand jury if he so chose. Many people of course preferred not to appear; such preferences were honored, wherever possible, consistent with the requirements of sound investigative procedure. (Affidavit at 3)

 It is the opinion of the Court that the defendant has failed to make out a sufficient showing of abuse of process to warrant dismissal of the indictment. This investigation was a lengthy one, and it is clearly no abuse of process for five people to be subpoenaed for interviews but not brought before the grand jury. In addition, the Court thinks it is sound and customary procedure for the prosecutors to interview witnesses before taking them to the grand jury in order to eliminate unnecessary material before the grand jury and save the time of the grand jurors.

Defendant relies in part on *Durbin v. United States*, 94 U.S.App.D.C. 415, 221 F.2d 520 (1954). The facts of this case deserve attention because it is apparent that the court did not hold that a prosecutor could never use the subpoena power to conduct interviews. In that case the prosecutor told the witness he could not leave the city until the prosecutor gave him permission. The witness left and was prosecuted for traveling in interstate commerce with intent to avoid giving testimony before the grand jury in a criminal proceeding. The court stated:

It is quite apparent that the Assistant thought the grand jury subpoena empowered him to restrain appellant's movements indefinitely, or at least until appellant made a statement which satisfied him; and this despite the fact that the grand jury recessed. (221 F.2d at 522)

In such extreme circumstances, the court held that the defendant could not be prosecuted for avoiding grand jury testimony. The instant case is clearly not such an extreme one.

The decisions in *United States v. Gurney*, 393 F.Supp. 683 (M.D.Fla.1974), and *United States v. Keen*, 509 F.2d 1273 (6th Cir. 1975), also relied on by the defendant, are not relevant to grand jury proceedings but hold that the government cannot issue subpoenas to compel witnesses to attend pretrial interviews.

On the other hand, courts have commented on the screening function played by the prosecutor in presenting a case before a grand jury. *See United States v. Johns-Manville Corporation*, 213 F.Supp. 65 (E.D.

Pa.1962). *See also United States v. Miller*, 508 F.2d 588 (5th Cir. 1975), in which the seven dissenters reasoned:

> The U. S. Attorney is the guiding arm of the grand jury, concerned with the orderly presentation of information before that body. It is customary practice in the courts for documents and witnesses to be subpoenaed in advance to eliminate unnecessary material, allow for the orderly presentation of evidence, and save the time of grand jurors. (508 F.2d at 594)

This Court agrees with the reasoning in *Miller* that the prosecutor may, and even should, take an active role in organizing the presentation of witnesses and documents before the grand jury to avoid needless repetition of evidence and to conserve the time of the grand jurors. Therefore, in the absence of compelling evidence of abuse of process, such as that in *Durbin, supra,* this Court will not dismiss an indictment because the prosecutors used the subpoena power to interview witnesses who were not subsequently brought before the Grand Jury. Such compelling evidence is lacking in the instant case where it has been shown only that five persons were interviewed privately and were not brought before the grand jury.

*Is there a duty of the prosecutors to present exculpatory evidence before the grand jury?*

Defendant contends that key witnesses, with substantial exculpatory information directly contradicting the allegations of the indictment, were purposefully not taken before the grand jury investigating this matter. The Court does not consider the several instances of witnesses not being called before the grand jury outlined in the affidavits sufficient to warrant dismissal of the indictment.

In the first place, the Court notes that the affidavits show that the defendant was given the opportunity to present the government with a list of exculpatory witnesses to be called before the grand jury but decided not to do so. The fact that the government gave the defendant that opportunity is an important factor in determining whether the government failed to present exculpatory information before the grand jury.

Second, the Court, after reviewing the decisions of other courts, does not agree with the defendant's contention that the government must present *all* information that might be exculpatory to the grand jury. As stated in a recent article on the history and functioning of grand juries:

> Along these same lines is the question of whether the prosecutor should be obliged to present evidence to the grand jury that is favorable to the prospective defendant. At trial, the prosecutor must disclose such exculpatory evidence to the defense. But in most states he is not bound to make such disclosures to the grand jury.

The rationale for this is again related to preventing adversary proceedings in the grand jury room. In addition, determining what is or is not or may be exculpatory is often difficult. Items of evidence that do not appear to be terribly meaningful to a prosecutor preparing to present a case to the grand jury may take on altogether different significance when viewed from the standpoint of the defense counsel at trial. It might place an unmanageable burden on the prosecutor at this stage to require him to discern and disclose possible matters of exculpation. At the same time certain items, such as confession by another to the crime the target is being charged with, are so obviously exculpatory that they cannot escape notice. (M. Frankel and G. Naftalis, 'The Grand Jury,' *The New Leader*, Nov. 10, 1975, at 22)

The court in *Loraine v. United States*, 396 F.2d 335 (9th Cir. 1968), held that the trial court's refusal to invalidate an indictment because the government did not produce before the grand jury all the evidence in its possession tending to undermine the credibility of witnesses appearing before that body was not error, stating:

> The suppression by the prosecution at the trial, of evidence favorable to the accused

violates due process where the evidence is material either as to guilt or punishment irrespective of the good faith or bad faith of the prosecution. . . . Evidence available for use at the trial may be material within the meaning of this rule, even though it goes only to the credibility of a witness. . . .

However, the duty of prosecuting authorities at the trial, and their duty when presenting a case before a grand jury, are not necessarily the same. Thus, an indictment, if returned by a legally constituted and unbiased grand jury and valid on its face may not be dismissed because it is based upon hearsay testimony . . ., incompetent evidence . ., or illegally seized evidence . . . .

Similarly, we hold that the trial court did not err in refusing to invalidate a federal indictment because the Government did not produce before the grand jury all evidence in its possession tending to undermine the credibility of the witnesses appearing before that body. Loraine was accorded the full protection of the Fifth and Fourteenth Amendments when, at the trial on the merits, he was permitted to expose all the facts bearing upon his guilt or innocence. (396 F.2d at 339)

Defendant relies in part on *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974). This case, however, has a narrow holding which is not directly applicable to the instant case. There the court held that the due process clause was violated when a defendant had to stand trial on an indictment which the government knew was based partially on perjured testimony, when the perjured testimony was material, and when jeopardy had not attached. The court did not hold that injustice resulted from the withholding merely of exculpatory information.

Defendant further relies on *United States v. DeMarco*, 401 F.Supp. 505 (C.D. Cal.1975). The court there held that the prosecutor's failure to inform the grand jury of defendant's colorable claim that the California charge was improperly brought by the government in an attempt to dis-suade defendant from seeking transfer to California of a criminal proceeding in the District of Columbia, required dismissal of the indictment. The court stated that the grand jury was entitled to know that the charge could be attacked as an unjustifiable exercise of the charging power. In that case, the disclosure required of the prosecutor went directly to the power of the grand jury to act at all. Exculpatory evidence, on the other hand, does not negate the entire authority of the grand jury and need not be disclosed.

Defendant relies heavily on *Johnson v. Sup. Ct. of California*, 38 Cal.App.3d 977, 113 Cal.Rptr. 740 (1974), aff'd, 15 Cal.3d 248, 124 Cal.Rptr. 32, 539 P.2d 792 (1975). In *Johnson*, prior to submission of the matter to the grand jury, petitioner's testimony at a preliminary hearing led the magistrate to dismiss the complaint charging him with the same offense. The district attorney did not bring this testimony to the attention of the grand jury. The court dismissed the indictment. The decision, however, was based entirely on statutory and not constitutional grounds. The court specifically stated that it need not consider petitioner's due process argument.

Nor did the court hold that the prosecutor had a duty to present *all* exculpatory evidence before the grand jury. Rather, it relied on the fact that the evidence the government had failed to present tended to "negate guilt." This is the same standard found in the ABA Standards, *The Prosecution Function*, § 3.6(b):

> The prosecutor should disclose to the grand jury any evidence which he knows will tend to negate guilt.

It would be difficult in the usual case for a court to know at the pretrial stage what evidence is sufficient to negate guilt. The court does not know what evidence the grand jury had before it in order to determine what further evidence it should have had. It would be an undue interference with the grand jury for a court to attempt to surmise what significance the grand jury would have attached to the testimony of various witnesses who were not

called before it. Only in a case in which the evidence clearly would have negated guilt or undermined the authority of the grand jury to act at all should a court act. Otherwise, a court runs the risk of interfering too much with the grand jury process and does so largely on the basis of guessing what evidence a grand jury might have found persuasive.

Finally, in its affidavit, the government has explained to the Court's satisfaction its failure to call certain witnesses before the grand jury. The government also makes the following general statement:

No witness with evidence assessed by prosecutors to be in fact exculpatory was, to our knowledge, not brought before the grand jury. On the contrary, a conscious effort was made to bring any such witness before the grand jury; so far as affiant is aware, that was done in every known instance.

 In the light of the defendant's failure to present clear and convincing evidence of prosecutorial misconduct as to the presentation of exculpatory evidence before the grand jury, the Court must accept the government's statement that it did present such exculpatory evidence. Further, as the Court has stated, there is no legal duty upon the prosecutor to present the grand jury with every piece of possible exculpatory evidence in its possession. Such a duty is reserved for the trial stage of the proceedings. The Court holds, therefore, that defendant's allegations as to the presentation of exculpatory information do not warrant the dismissal of the indictment.

### Did intimidation of witnesses deprive the defendant of an unbiased grand jury?

Defendant's claim of intimidation appears to be two-pronged. On the one hand, it is contended that in the course of appearances of witnesses before the grand jury, the prosecutors, out of the presence of the grand jury, in conferences with the witnesses or their attorneys, expressed dissatisfaction or disbelief in the testimony being given, and extended the opportunity to recant. On the other hand, it is claimed that some witnesses were put in fear by being advised that they might be the subject of investigation themselves for unrelated activity in which they had been engaged, and that on occasion witnesses were interrogated before the grand jury intensely over a period of days at great strain.

The difficulty the courts have with remarks of prosecutors suggesting that a witness is lying is that such remarks may unduly prejudice the grand jury's deliberations and lead the jurors to return an indictment on the basis of these remarks. If the remarks are not made before the grand jury this difficulty is eliminated. The cases cited by defendant all deal with remarks made by the prosecutor to witnesses before the grand jury. In *United States v. Wells,* 163 F. 313 (D.Idaho, 1908), the witnesses questioned were also potential defendants and were subsequently indicted upon the evidence taken. The court held the prosecutor was guilty of misconduct, not only for the manner in which he examined the defendants but also because he addressed the grand jury prior to its deliberation, improperly expressing his opinion that the defendants were guilty. In *United States v. DiGrazia,* 213 F.Supp. 232 (N.D.Ill.1963) the prosecution, in the face of invocation by defendant of her Fifth Amendment privilege against self-incrimination, asked her questions which, by their form and manner, reflected adversely upon her in the eyes of the grand jury.

The incidents reported by defendant in the affidavits filed in the present case can be distinguished in two ways from the cases just discussed:

1. The remarks of the prosecutor were not directed to the defendants themselves but to witnesses who were not prospective defendants, and

2. The remarks were not made before the grand jury but in private interviews.

 In view of these distinctions, the prosecutor's remarks could not have unfairly influenced the grand jury against the defendants in the present case since it is not alleged that the grand jury ever knew

about these remarks if they were in fact made.

▇ Further, it is not alleged or suggested that the tactics of the prosecutors caused the witnesses to change their minds and to testify against the defendant when they had planned to testify in his behalf. Defendant cannot show that he was prejudiced by the tactics attributed to the prosecution since his witnesses remained firm in the face of the alleged intimidation.

▇ Nor does the Court think that advising some witnesses that they might be the subject of an investigation themselves constitutes misconduct on the part of the prosecutors. On the contrary, it is the prosecutor's duty to make witnesses aware of any potential investigations so those witnesses can conduct their actions accordingly.

The government in its affidavit states: No witness was, to the knowledge of affiant, ever falsely advised that he was a subject or potential subject of investigation. Furthermore, such advice was given only where appropriate and only for legitimate purposes.

The Court accepts the government statement and finds there was no prosecutorial misconduct involved in advising witnesses of possible investigations. Again, the defendant has failed to allege that any witnesses changed their minds because of such advice and thus has not shown he was prejudiced thereby.

*Did the prosecution abuse the Court's process in connection with grand jury subpoenas duces tecum?*

▇ Defendant contends that the prosecutors in this case abused the process of the Court by issuing, indiscriminately and unreasonably, subpoenas duces tecum to banks and other institutions in connection with which it is alleged the defendant had a reasonable expectation of privacy. Specifically it is claimed that the use of such subpoenas amounted to an unlawful search and seizure in the following respects:

1. indiscriminate and unreasonable use of vast numbers of subpoenas;

2. issued without regard to whether they were returnable on a day when the grand jury was in session;

3. issued in the broadest form without any attempt to limit their command to reasonable bounds;

4. required the assembly of huge volumes of materials fed informally to prosecutors;

5. no effort at specification; and

6. multiple subpoenas issued in series.

The defense asserts that the decision in *United States v. Miller*, 500 F.2d 751 (5th Cir. 1974) compels the conclusion that the circumstances of the issuance of the subpoenas in the present case constituted an illegal search and seizure.

The Fifth Circuit reconsidered the holding in *Miller* some months after the initial decision. In the face of a vigorous dissent, the court refused to grant a rehearing *en banc* by an eight to seven vote. *United States v. Miller*, 508 F.2d 588 (5th Cir. 1975). Certiorari was granted in June, 1975 and oral argument heard on January 12, 1976. *United States v. Miller*, 421 U.S. 1010, 95 S.Ct. 2414, 44 L.Ed.2d 678 (1975).

The basic holding in *Miller* relied on by defendant here is stated by Circuit Judge Goldberg at page 756 of 500 F.2d:

[W]e hold that obtaining copies of Miller's bank checks by means of a faulty subpoena duces tecum constituted an unlawful invasion of Miller's privacy, and that any evidence so obtained should have been suppressed.

The Court is not prepared at this time to apply the teaching of *Miller* in the present case for the following reasons:

1. The holding in *Miller* is narrowly confined to specific items of evidence—a deposit slip and copies of several of defendant's checks. The scope of the suppression sought by defendant in the present case is totally unclear and could be construed to extend to all of the documents obtained by subpoena in the course of the investigation.

2. The holding in *Miller* appears based in part on a defect in the process

issued—i. e., the claim that the subpoenas were not legitimate grand jury subpoenas. There is no sufficient showing that the subpoenas issued in the present case were similarly flawed.

3. If the government at trial seeks to introduce evidence demonstrably within the reach of the *Miller* holding, a suppression hearing could be held at that time.

4. The Supreme Court may render a decision in the *Miller* case before the admissibility issue is reached, and its decision may help bring the issue into clearer focus.

Until the Supreme Court speaks or this Court otherwise determines that such action is necessary, the government need not categorize the subpoenas issued in the manner requested by paragraph A12(a)–(j) at pages 6 and 7 of the affidavit of Arnold M. Weiner or furnish the Court with the further information requested in Mr. Weiner's letter to Mr. Skolnik of March 29, 1976.

*Did the prosecutor's allegedly intemperate remarks at the arraignment hearing amount to professional misconduct?*

■ At the arraignment hearing in this case on December 4, 1975, Assistant United States Attorney Barnet D. Skolnik made statements to the effect that the evidence in the possession of the government and of the grand jury which indicted defendant Mandel indicated "overwhelmingly his guilt. If that were not so, he would not have been indicted. Period." These remarks were made in the course of the government's argument in support of a petition for a restrictive order to prohibit any out-of-court statements by persons involved in the case. The defense contends that such remarks were improper as an expression of personal opinion by the prosecutor of the justness of the government's case and the guilt of the accused.

When the remark was made, the Court interrupted and stated:

The function of an indictment is as well-known to you as it is to any of defense counsel. An indictment is not evidence; it is simply the formal means by which the Government brings a case into court. I would ask you to recognize that function of the indictment.

At that point Mr. Skolnik stated:

Your Honor, that is absolutely so, and I was not speaking or—and did not in any way intend to be perceived as speaking to the indictment itself. I was speaking, as Mr. Mandel has in recent days been speaking, to the nature of the evidence in the possession of the Government and of the Grand Jury which returned that indictment.

He has said, sir, publicly that the evidence in the possession of the Government shows that Mr. Mandel is innocent. I was speaking, sir, to that assertion. Mr. Mandel has, since his indictment, also stated that this office deliberately withheld exculpatory information from the grand jury.

Thus it is seen that the government contends that the remarks must be viewed in the context in which they were made, which the government alleges over the previous several days had included public denunciations of the integrity of the prosecution and the prosecutors and the leaking to the press the day prior to the arraignment of a letter from defendant Mandel written to the Justice Department on November 19, 1975 accusing the government prosecutors of varied forms of misconduct.

Without attempting to characterize the propriety of the remarks made, they are not such as in the Court's view should vitiate the indictment or to call for any direct action by the Court at this time. The Court in its earlier opinion denying the restrictive order made clear its expectation that henceforth both sides would act with the restraint appropriate to the proper conduct of a criminal proceeding. It also appears to the Court that voir dire examination of the jury panel will show whether anything said by the prosecution has so affected the objectivity of the jurors that a fair trial cannot be had.

*Summary*

The Court holds that the defendant has not met his burden of showing prosecutorial misconduct so as to warrant dismissal of the indictment. In so holding, the Court noted that it was not an abuse of the subpoena power to employ it to conduct private interrogations of witnesses since it is the duty of the prosecutor to organize the material presented before the grand jury and eliminate any that is repetitious or unhelpful. The Court further stated that the prosecutor has no duty to present all exculpatory evidence to the grand jury as the grand jury proceedings are not adversary proceedings.

The Court also found that the alleged intimidation of witnesses did not deprive the defendant of an unbiased grand jury. The grand jury was not aware of any such intimidation, assuming it existed, nor does defendant allege that the intimidation was so effective that it caused the witnesses to change their testimony. Fourth, the Court noted that it could not decide at this time whether the issuance of certain subpoenas duces tecum amounted to an unlawful search and seizure and that such a determination would have to await a suppression hearing at time of trial, if it is to be made.

Finally, the Court stated that the prosecutor's remarks at the arraignment hearing were not such as to vitiate the indictment or call for any action on the Court's part at this time.

In addition, in the course of one of the defense affidavits, the defendant requested that the government compile certain materials, including subpoenas, for the Court's inspection. The Court holds that the defendant has failed to make a sufficient initial showing of misconduct so as to warrant further investigation. Therefore, the Court will not direct the government to turn over any materials at this time. Of course, the government should keep any such materials in its possession in case the Court should direct their production during the trial if need arises.

For the reasons stated, it is this 5th day of April, 1976, by the United States District Court for the District of Maryland, hereby

*ORDERED* ;

(1) that the defendant's Motion for Dismissal of Indictment or in the Alternative, for Suppression of Evidence and other Appropriate Relief for Prosecutorial Misconduct be, and the same hereby is, *Denied* ;

(2) that the defendant's requests that the government compile and produce certain materials be, and the same hereby are, *Denied* ; and

(3) that the Clerk of the Court keep under seal the affidavits filed in support of this motion by the defendant and by the government until such time as the Court directs that they be unsealed and made a part of the court file.

## MEMORANDUM AND ORDER DENYING SEVERANCE

Defendants Ernest Cory and Irvin Kovens have moved for severance and separate trials in separately-filed motions. These motions will be considered together by the Court in this Memorandum and Order.

### I. *Misjoinder under Rule 8*

Defendant Cory contends that there has been a misjoinder of offenses under Rule 8(a) of the Federal Rules of Criminal Procedure and a misjoinder of defendants under Rule 8(b). If there has been a misjoinder under Rule 8, then the Court must order severance.

██ It should first be noted that Rule 8(a) deals with joinder of offenses committed by a single defendant and has no application when two or more defendants are involved. 1 C. Wright, *Federal Practice and Procedure* § 144, at 318 (1969). Thus, the Court need consider only defendant's argument under Rule 8(b). Rule 8(b) provides:

(b) *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the

same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

█ The standard in Rule 8(b) for joinder is quite broad. Defendants joined in an indictment need only be alleged to have participated "in the same act or transaction" or "in the same series of acts or transactions." By the specific terms of the rule, it is not necessary for each defendant to be named in every count. In *Cataneo v. United States,* 167 F.2d 820 (4th Cir. 1948), the court reviewed the standards under Rule 8 and held that it should be interpreted broadly. In that case, the indictment charged a Selective Service registrant and his codefendant with making and causing to be made false statements in an affidavit to the Selective Service Occupational Deferment Form and charged the registrant and a different codefendant with making and causing to be made false statements in a letter to the Draft Board on behalf of the registrant. The court held there was proper joinder, stating:

> For our purposes, the key-word here [in Rule 8] seems to be 'transaction.' This is not a technical term, nor is it a word of art. . . . Oft-quoted is the remark (under Equity Rule 30) of Mr. Justice Sutherland, in *Moore v. New York Cotton Exchange,* 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750, 45 A.L.R. 1370:
>
> > " 'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship."
>
> Clark on Code Pleading, page 309, thinks the word should be given a broad meaning 'to carry out what all procedural rules are designed to accomplish, namely, convenience and efficiency in trials.' . .
>
> Under the rules before us, an interpretation of the word 'transaction' frequently

involves the balancing of conflicting interests: (1) speed, efficiency and convenience in the functioning of the federal judicial machinery; against (2) the right of the accused to a fair trial, without any substantial prejudice to that right occasioned by the joinder of offenses and/or defendants. (167 F.2d at 822–823)

In *United States v. Gentile,* 495 F.2d 626 (5th Cir. 1974), the court held there had been improper joinder in a narcotics indictment. The court discussed Rule 8(b) in the course of its holding:

> The purpose of the rule is, in the interest of convenience and expediency, to encourage joint trials while at the same time limiting as much as possible the admission at trial of prejudicial evidence against a defendant. Moore, *Federal Practice,* ¶ 8.06[2], at 8–36 (1965).
>
> . . . Whether or not separate offenses are part of a 'series of acts or transactions' under 8(b) depends in turn on the relatedness of the facts underlying each offense. . . . [citations omitted] While criminal acts of several defendants may be similar in nature, these acts cannot be properly joined in a multiple defendant trial if different facts and circumstances must be established to support the alleged violations. But when the facts underlying each offense are so closely connected that proof of such facts is necessary to establish each offense, joinder of defendants and offenses is proper. For example, if one person is charged with theft of goods in interstate commerce and a second person is charged with receiving goods that were stolen in interstate commerce, the two offenders may be joined for trial because the facts that must be established to support a violation of each offense are basically the same. They form a series of acts or transactions. . . . [citations omitted] In this situation joinder of both offenses for trial fulfills the purpose underlying the rule because it avoids duplication of time and effort of both the prosecution and the courts and minimizes the prejudice to the defendants. The government has to prove and the court

must listen to the evidence supporting the offenses only once, and the defendants are not prejudiced because essentially the same proof must be established with regard to each defendant whether or not they are jointly or severally tried. . . . (495 F.2d at 630)

The Court summarized the instant indictment in its Memorandum and Order of March 23, 1976. In essence, the indictment charges that the defendants devised a scheme to defraud the citizens and the state of Maryland by bribing the Governor to assist legislation which would be financially beneficial to the owners of Marlboro (and later Bowie), whose identities were deliberately concealed from the public, the legislature, and the Racing Commission by all of the defendants. The indictment also charges that it was further a part of the scheme that defendant Mandel use his powers as Governor to channel state business to business entities in which defendants Hess, William A. Rodgers and Harry W. Rodgers had financial interests, without revealing to the public or the governmental bodies involved his own business involvement with those defendants, including those interests in Security Investment and Ray's Point which he had received from those defendants as bribes, and the existence of which was actively concealed by defendants Mandel, Hess, William A. Rodgers and Harry W. Rodgers.

 It is true that defendants Cory and Kovens are named in only the first part of the scheme, that involving Marlboro, and not the second part involving Security Investment and Ray's Point. However, it is not necessary that each defendant be named in every part of the scheme as long as he plays a role in some part of that scheme. The twenty mail fraud counts and four racketeering counts contained in the instant indictment constitute offenses, in the Court's opinion, that arise out of "the same series of acts or transactions." The important point to be proven at trial is that each of the defendants participated in a scheme to defraud. In that circumstance, whether or not each was personally in-

volved in every aspect of the scheme is irrelevant. The Court holds, therefore, that there has been no misjoinder of defendants under Rule 8(b).

 In holding that joinder is proper, the Court has considered several factors. First, the language of Rule 8(b) is very broad, and it has also been interpreted broadly by the Fourth Circuit in *Cataneo, supra.* Second, the indictment does allege one scheme, and it is not necessary for each defendant to be a participant in every aspect of a scheme so long as he participates in some part of it. Third, the same set of facts and circumstances must be established to support the alleged violations of Cory and Kovens as must be proved against the other defendants. The fact that *additional* facts must be established against the other defendants to support the alleged violations involving Ray's Point and Security Investment is not sufficient reason to hold that there has been misjoinder. Fourth, joinder furthers speed, efficiency and convenience in the functioning of the federal judicial machinery.

Having held that joinder is proper under Rule 8, the Court will consider defendants' arguments of prejudicial joinder under Rule 14.

## II. *Bruton Problems*

Rule 14 of the Federal Rules of Criminal Procedure provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

Both defendants contend that severance is warranted under Rule 14 under the rule

of law established in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In that case, which expressly overruled *Delli Paoli v. United States*, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), the Supreme Court held that it was constitutionally impermissible to admit into evidence at a joint trial an extra-judicial statement of a co-defendant which implicated the accused. Such a procedure was held to violate the accused's Sixth Amendment right of confrontation. Defendant Cory relies on *Bruton* in contending:

In the present case there is a strong possibility that extra-judicial statements of defendant Cory's co-defendants made before the grand jury, to the prosecutors, or elsewhere out of defendant Cory's presence, would be admitted into evidence at a joint trial.

Defendant Kovens contends that the government "may well" seek to introduce at trial *Bruton* materials. He asks that the Court order the government to deliver to the Court for inspection *in camera* any statements or confessions made by any defendants which the government intends to introduce in evidence at the trial. The defendant also asks that the Court direct the government to produce these documents for inspection by the defendant.

■ The main difficulty with defendants' contentions based on *Bruton* is that there is no present reason to believe that any defendant in this case will not testify. Under such circumstances, it is clear that the *Bruton* rule is not applicable. In *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Supreme Court held that a California · statute providing that evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the witness is given the opportunity to explain or deny the prior statement does not violate the confrontation clause of the Sixth Amendment. The Court stated:

Viewed historically, then, there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination. (399 U.S. at 158, 90 S.Ct. at 1935, 26 L.Ed.2d at 497)

The Court in *California v. Green, supra,* specifically discussed the *Bruton* opinion, stating:

Again, in *Bruton v. United States* . . ., the Court found a violation of confrontation rights in the admission of a codefendant's confession, implicating Bruton, where the co-defendant did not take the stand. The Court again emphasized that the error arose because the declarant 'does not testify and cannot be tested by cross-examination,' . . . suggesting that no confrontation problem would have existed if Bruton had been able to cross-examine his co-defendant. . . . (Id. at 163, 90 S.Ct. at 1938, 26 L.Ed.2d at 500)

In *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971), the Supreme Court held that where the codefendant of the petitioner took the stand at their joint trial in his own defense, denied making an alleged out-of-court statement implicating petitioner, and proceeded to testify favorably to petitioner concerning the underlying facts, petitioner was denied no rights protected by the Sixth and Fourteenth Amendments, despite the contention that effective confrontation was possible only if the codefendant affirmed the statement. The Court stated:

It was clear in *Bruton* that the 'confrontation' guaranteed by the Sixth and Fourteenth Amendments is confrontation *at trial*—that is, that the absence of the defendant at the time the codefendant allegedly made the out-of-court statement is immaterial, so long as the declarant can be cross-examined on the witness stand at trial. . . . The Constitution as construed in *Bruton*, in other words, is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination. (402 U.S. at 626–627, 91 S.Ct. at 1726, 29 L.Ed.2d at 226)

▮ Because *Bruton* applies only where a codefendant is not planning to take the stand and because there is no indication that any of the defendants will not take the stand, the Court holds that defendants Cory and Kovens are not entitled to severance on the basis of the *Bruton* doctrine. Nor under these circumstances, will the Court order the government to turn over any statements of codefendants either to the Court or to defendants.

### III. *Guilt by Association*

Defendant Kovens contends that joinder creates an undue and unnecessary risk of his being deemed "guilty by association." This contention is based on the fact that Kovens is not involved in that part of the scheme related to Security Investment and Ray's Point. He argues that evidence introduced involving Security Investment and Ray's Point will be associated with his guilt or innocence in the jury's mind because the jury would not be able to keep the evidence and the defendants separate.

Although Cory does not use the phrase "guilty by association," he contends that in view of the anticipated length of the trial, the number of counts in the indictment, the number of defendants in the case, and the great amount of evidence that will be introduced at the trial, it is "inconceivable" that the jury will be able to remember all of the evidence as it applies to each specific defendant. He further contends that the introduction of evidence with respect to controverted matters of the other defendants in which he had no interest would be seriously confusing to the jury and severely prejudicial to his defense.

Both defendants, at oral argument, supplemented the arguments made in their written motions by referring to the government's Bill of Particulars which was filed on March 19, 1976. Paragraph "f" of the Bill of Particulars outlines the "various contracts, leases and other benefits" alluded to in paragraph thirty-one of the indictment. Defendants contend that it is apparent from paragraph "f" that the government will attempt to place into evidence a host of contracts, leases and awards involving seven business entities and to rely upon such evidence to prove the central allegations of the indictment. Defendants go on to argue that it is not alleged that they are associated in any way with the seven business entities, that they derived any benefit from the award of any contracts or leases to said entities, or that they participated in causing the award of said contracts or leases. Therefore, they conclude, their motions for severance should be granted.

▮ The Court agrees with the government that the defendants, in focusing on these seven entities, are focusing on aspects of the case that are not central to the indictment. It appears that the evidence the government will seek to introduce involving these entities will be only a small percentage of the total evidence. Thus, the danger that the jury will be overwhelmed by a great body of such evidence is minimal and not sufficient to warrant a severance at this stage of the proceedings.

▮ The Court begins by noting that one defendant is not entitled to a severance merely because evidence against his codefendants may be more extensive than the evidence against him. It is the Court's obligation, through proper instructions and any other devices, to make certain that the jury separates in its own mind the evidence and the defendants. In *Kroll v. United States*, 433 F.2d 1282 (5th Cir. 1970), *cert. denied*, 402 U.S. 944, 91 S.Ct. 1616, 29 L.Ed.2d 112 (1971), a mail fraud case, the court stated:

> When possible without prejudice to the rights of defendants joint trial aids in the efficient administration of justice. Particularly is this so when, as here, severance would require the expense of several long trials involving substantially the same evidence. The various arguments that some of the defendants played larger roles than others in the alleged conspiracy, or that some of the defendants had allegedly 'antagonizing personalities' which a jury might not like, or that the impeachment of one of the defendants might 'rub off' on the other defendants,

taken singly or together, do not present grounds for separate trials. The trial court fairly and fully admonished the jury during his complete and detailed instructions to consider the guilt or innocence of each defendant only upon the evidence introduced against him and to determine its verdict separately as to each defendant under each count of the indictment. (433 F.2d at 1287)

In this circuit, the court in *United States v. Shuford*, 454 F.2d 772 (4th Cir. 1971), expressed its preference for joint trials unless a substantial degree of prejudice would result. In that case, the court held that where severance was the only way of affording the defendant any possibility of persuading his codefendant to testify, it was error to deny the motion for severance. The court stated:

Primarily for reasons of economy of time in judicial administration, the general rule has evolved that persons jointly indicted should be tried together. . . . This rule has particular strength where, as here, one crime may be proved against two or more defendants on a single set of facts or from the same evidence. . . Notwithstanding the need for efficiency in judicial administration, a joint trial is inappropriate if it sacrifices a defendant's right to a fundamentally fair trial. . .

For these reasons, although Rule 14 of the Federal Rules of Criminal Procedure places the grant or denial of a severance in the sound discretion of the trial judge . . . , if a 'substantial degree of prejudice' springs from a joint trial, a severance is mandated. . . . Not surprisingly, the facts peculiar to each case will determine whether sufficient prejudice exists to make the denial of a severance reversible error. (454 F.2d at 775–776; citations omitted)

A defendant cannot claim that a "substantial degree of prejudice" will result from his trial with his codefendants simply because more evidence will be introduced against his codefendants. The court in *United States v. Frumento*, 405 F.Supp. 23

(E.D.Pa.1975), a racketeering case, specifically considered a similar claim of "guilt by association" due to disparate amounts of evidence and reasoned:

Finally, while the possibility of 'guilt by association' exists in a joint trial, this does not afford a ground for severance. . . . As the Supreme Court has explained:

"This type of prejudicial effect is acknowledged to inhere in criminal practice, but it is justified on the grounds that (1) the jury is expected to follow instructions in limiting this evidence to its proper function, and (2) the convenience of trying different crimes against the same person, and connected crimes against different defendants, in the same trial is a valid governmental interest. *Spencer v. Texas*, 385 U.S. 554, 562, 87 S.Ct. 648, 653, 17 L.Ed.2d 606 (1967)." (405 F.Supp. at 31)

This Court, in denying a motion for severance in a recent narcotics case, *United States v. Moore*, HM 75–0363, considered the argument that prejudice stemmed from the fact that among the thirteen defendants there were varying levels of involvement in the alleged conspiracy and different amounts of proof. The "subordinates" were afraid that they would be unjustly tainted by the evidence against the "leaders." This Court reasoned:

In the instant case, defendants have not made a showing of substantial prejudice which would warrant a severance. They have merely complained of the burdens which a conspiracy charge necessarily places upon the defense. There has been no showing that the quantum of evidence that will be introduced will be so grossly disparate for the leaders and the subordinates that the evidence will 'spill over' into the subordinates. (Memorandum and Order, October 9, 1975, at 3)

The Court also noted that the cautioning instructions would not be so complex and frequent that the jury would confuse the defendants and the evidence.

In *United States v. Johnson*, 298 F.Supp. 58 (N.D.Ill.1969), a prosecution for mail

fraud involving fraudulent insurance claims, one defendant moved for severance on the ground that he was not named in all counts. The court was not convinced:

> However, the same evidence must be produced in any trial of the defendants on both the substantive counts and the conspiracy count. The defendant Kaplan was allegedly an integral part of the underlying scheme to defraud. Separate trials would be a burden upon the court, the juries, the witnesses and the Government. The defendant has not shown this court that such a considerable burden would be overbalanced by resulting prejudice to him. (298 F.Supp. at 63)

Two other defendants also claimed that the jury would not be able to keep the evidence separate. The court stated:

> However, the court finds that the subject matter of the indictment is not of such a complex or technical nature as to make the jury's task of separately assessing the evidence relating to each defendant impossible or unduly complex. . . .
> The defendants have failed to carry their burden of showing this court that they will not be able to obtain a fair trial if severance is not obtained. (*Id.* at 64)

The importance of cautionary instructions to the jury was further discussed in *Tillman v. United States*, 406 F.2d 930 (5th Cir.), vacated on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). Defendants in that case were convicted of interfering with the administration of the Universal Military Training and Service Act and willfully injuring property of the United States during picketing at an armed forces entry and examining station as a protest against the war in Vietnam. The court reasoned:

> The existence of prejudice, in large measure, depends upon the facts and circumstances of each case . . . , and it is axiomatic that the granting of a severance is within the discretion of the trial judge. . . . The burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed on review. . . . The de-

fendant must show something more than the fact that 'a separate trial might offer him a better chance of acquittal.' . .

Appellants allege that they were prejudiced and their trial rendered unfair because the jury was unable to collate the evidence and connect the names and faces of each defendant with the independent evidence being offered against him. In essence, it is alleged that the convictions rested upon an unlawful cumulation of evidence, and that had there been separate trials, the appellants would not have been convicted. . . . The test for prejudice in this context is

> ". . . whether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted." (406 F.2d at 934–935; citations omitted)

■ Considering the role that jury instructions play in deciding whether severance should be granted, the Court finds that in this case the indictment is not so complicated that a jury could not keep separate the six defendants and the evidence pertaining to each one. The Court also notes that a defendant seeking severance has the burden of convincing the Court that severance is warranted. As the court stated in *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974), a prosecution for conspiracy and mail fraud arising out of staged collisions by which defendants created false claims against insurance carriers:

> To obtain a severance under Rule 14, the movants have the burden of convincing the Court that without such drastic

relief they will be unable to obtain a fair trial. . . . A mere showing of some prejudice has usually been insufficient, for qualitatively it must be the most *compelling* prejudice against which the trial court will be unable to afford protection. . . . (489 F.2d at 65)

The court considered the interests in trial economy in approving the placing of a heavy burden on a defendant moving for severance:

Whenever a crime involves more than one actor, there arises a need to balance the interests of the government in trial economy and in presenting at one time the whole of an illegal operation on the one hand against the need for protecting the rights of the individual defendant on the other. . . . The rules are liberal in permitting joinder at trial, both of offenses and of defendants. Although this permits wide latitude on the prosecution in determining the form in which the case is to be prosecuted the trial court has both the duty and the authority to order a severance at any time during the trial if it believes that impermissible prejudice would otherwise result. Thus, the serious problem of reconciling the sometimes competing interests of trial economy and danger of prejudice to defendants necessarily resides in the discretion of the trial judge. Motions for severance under Rule 14 have rarely been granted and the trial court's decision has not been disturbed absent a clear showing of abuse. . . . The general rule has been, and remains, that persons jointly indicted should be tried together. (*Id.* at 64–65)

"Economy of time in judicial administration" was also mentioned in *United States v. Shuford, supra,* as a relevant consideration in determining whether a defendant has met his burden, as well as in *United States v. Johnson, supra.* In this regard, the Court notes that the instant trial is expected to last anywhere from six weeks to three months and that repetition of this trial would indeed pose a burden on the Court, particularly since Cory and Kovens want to be tried separately from each other.

 The Court, then holds that defendants Cory and Kovens have not met their burden of demonstrating that a substantial degree of prejudice would result from a joint trial as a result of the disparity in the evidence among the defendants or of possible "guilt by association." In so holding, the Court notes that the burden on a defendant seeking severance is a heavy one. It further notes that the law generally favors joint trial for reasons of judicial economy and the presentation of the whole of an alleged illegal operation at one time. Finally, this Court recognizes that cautionary jury instructions can go far to eliminate any potential jury confusion.

## IV. *Prejudicial Publicity*

Defendant Kovens contends that extensive pretrial publicity concerning his codefendants will operate to prejudice him severely and to deny his right to a fair trial if he is tried jointly with his codefendants. Related to this contention is his argument that improper conduct on the part of a member of the staff of the United States Attorney at the arraignment proceedings has operated to make joinder with defendant Mandel highly prejudicial.

 The Court agrees with the government that the short answer to defendant's concern is that a carefully conducted voir dire examination is designed to deal with such problems. The Court in its Memorandum and Order on the Motion for Change of Venue emphasized the importance of resorting to voir dire before ruling on such a motion. The reasoning set forth in that opinion is applicable here. A defendant seeking severance has the burden of showing actual prejudice and no such showing can be made in this case until voir dire. If it appears at that time that severance if warranted, the Court will then consider such action upon motion by defendant.

The court in *United States v. Balistrieri,* 346 F.Supp. 336 (E.D.Wis.1972), reached the same conclusion as this Court:

In my opinion, Mr. DiGiorgio's motion for severance is premature. The possibility of tainture of jurors by media publicity surrounding a co-defendant can be adequately explored at trial during the voir dire of prospective jurors. During the trial, measures can be taken to insure that the jurors remain free from taint. (346 F.Supp. at 339–340)

■■■ The Court finds it unnecessary to consider whether or not the conduct of Mr. Skolnik at the arraignment was proper. It is sufficient for purposes of this motion that the Court hold that voir dire can guard against any prejudice that might have resulted from the arraignment proceedings, regardless of the propriety of the government's conduct.

In sum, the Court holds that defendant Kovens has not made a sufficient showing of substantial prejudice resulting from publicity to entitle him to severance at this time.

## V. *Inconsistent Defenses*

■■■ Defendant Cory contends "that the defenses of the defendants here are in conflict and antagonistic and a joint trial will severely limit his ability to present his own defense on the merits." To obtain a severance on the basis of inconsistent defenses, a defendant must show not only that his and the other defendants' defenses are inconsistent but that they are so antagonistic as to approach being mutually exclusive. *United States v. Wilson*, 500 F.2d 715, 723 (5th Cir. 1974), *cert. denied sub nom. Levin v. United States*, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975), and *United States v. Leonard*, 161 U.S.App.D.C. 36, 494 F.2d 955, 966 (1974). Defendant at oral argument in the Court's view did not support his assertion of inconsistent defenses with any sufficiently specific facts about how his defense might be antagonistic with that of his codefendants. As noted above, defendant has a heavy burden to demonstrate substantial prejudice from a joint trial, and defendant's conclusory allegations do not come close to meeting this burden.

Thus, the Court denies defendant Cory's motion for severance on the basis of inconsistent defenses.

## VI. *Conclusion*

Having considered the above arguments of defendants Cory and Kovens, the Court holds that neither defendant is entitled to severance under either Rule 8 or Rule 14. Defendants have not met their burden of showing that a substantial degree of prejudice would result from a joint trial. In the absence of such a showing, the Court trusts that appropriate cautionary instructions will remove any potential prejudice that might arise out of jury confusion. The Court also finds that resort to voir dire is an effective manner in this instance to handle the problem, if any there be, of pretrial publicity. Finally, the Court has been guided in reaching its decision by the policy in favor of joint trials and by considerations of judicial economy, both decisive factors in the absence of any specific showing of prejudice.

Accordingly, it is this 5th day of April, 1976, by the United States District Court for the District of Maryland,

*ORDERED* :

(1) that the motion of Defendant Ernest Cory for severance be, and the same hereby is, *Denied* ;

(2) that the motion of defendant Irvin Kovens be, and the same hereby is, *Denied* ; and

(3) that both motions be, and the same hereby are, *Denied without prejudice*, to be renewed if desired by defendants upon completion of voir dire.

## MEMORANDUM AND ORDER DENYING MOTION TO DISMISS

Defendant W. Dale Hess has moved this Court for an order dismissing the indictment against him pursuant to Rule 12 of the Federal Rules of Criminal Procedure. This motion has been adopted by the other five defendants.

## I. *Arguments of Defendant Hess*

Defendant alleges as grounds for his motion the following two points:

1. The lengthy pre-indictment delay deprived the defendant of his Fifth Amendment right to due process of law and Sixth Amendment right to a speedy trial, and

2. Massive pre-indictment publicity prejudiced the grand jury in its deliberations.

In support of his argument of pre-indictment delay, defendant states that on April 15, 1974, he was informed by the United States Attorney's office that he was a "target" of a federal grand jury investigation. Defendant was indicted on November 24, 1975. During the months prior to the indictment, defendant contends, he was the subject of massive pre-indictment derogatory publicity. Defendant further contends that the government knew of the voluminous publicity, participated in it, and welcomed and benefited from the publicity. The longer the investigation continued, Hess argues, the more newspaper articles and news broadcasts of a derogatory and prejudicial nature were disseminated, all with the effect of conditioning the people of Maryland into being receptive to the idea that they had been defrauded by their Governor and his close associates.

Defendant further contends that, in addition to the prejudice to his right to an impartial jury and fair trial due to the publicity, a delay in notifying a putative defendant of the charges to be pressed breeds prejudice by delaying his preparation while the government further develops and prepares its case.

Defendant bases his claims on both the Fifth Amendment due process clause and the Sixth Amendment right to a speedy trial. He concludes that the delay in indicting him was arbitrary and capricious and that he has been substantially prejudiced "on a number of accounts" as a result. In order to prevent a miscarriage of justice, defendant requests a dismissal of the indictment.

Defendant's second contention is that massive pre-indictment publicity prejudiced the grand jury in its deliberations. He contends that the grand jury, as the focal point of attention throughout the lengthy period of investigation, would be infinitely more attuned to media coverage than the average citizen. Thus, it is submitted that the indictment should be dismissed.

## II. *Arguments of the Government*

The government contends that there was no delay in this case and that defendant was indicted within a reasonable time after the grand jury first began to learn about the transactions at the heart of the case. The government further contends that defendant's argument is without legal merit even assuming there was some delay.

The government turns first to defendant's Fifth Amendment contentions and states that actual dismissal of an indictment or reversal of a conviction on the grounds of pre-indictment delay is rare. It is contended that there must be both an unreasonable delay intended to gain a tactical advantage and actual prejudice to a defendant's right to a fair trial, and that neither element is present in the instant case.

The government then contends that the Supreme Court in *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), foreclosed defendant's alternative argument that pre-indictment delay violated his Sixth Amendment right to a speedy trial, since the Court held in *Marion* that the Sixth Amendment's speedy trial provision does not attach until a putative defendant becomes an accused through either a formal indictment or arrest.

The government next argues that defendant's contention of prejudice before the grand jury is not supported by the facts, that defendant makes no specific showing of grand jury bias and that defendant does not demonstrate in any way how pre-indictment publicity may have prejudiced the grand jury deliberations. The government concludes that dismissal of the indictment is therefore unwarranted.

III. *Pre-Indictment Delay*

A. *Defendant's Sixth Amendment Right*

The Court will begin its analysis of the questions presented with a discussion of *United States v. Marion, supra. Marion* involved the prosecution of two defendants for alleged fraudulent business practices. The lower court dismissed the indictment for lack of speedy prosecution on the basis of a three year delay between the occurrence of the alleged criminal acts and the filing of the indictment, and the United States brought direct appeal. The Supreme Court held that the Sixth Amendment's guarantee of speedy trial is applicable only after a person has been "accused" of a crime and that defendants' due process claims were speculative and premature because defendants had not claimed or proved actual prejudice resulting from the delay.

The Court rejected appellees' argument that the Sixth Amendment applied to pre-indictment delay:

In our view, however, the Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an 'accused,' an event that occurred in this case only when the appellees were indicted on April 21, 1970. (404 U.S. at 313, 92 S.Ct. at 459, 30 L.Ed.2d at 474)

The Court began by examining the language of the Sixth Amendment and found:

These provisions would seem to afford no protection to those not yet accused, nor would they seem to require the Government to discover, investigate, and accuse any person within any particular period of time. (*Ibid.*)

The Court held that the Sixth Amendment could be invoked post-indictment or post-arrest only:

Invocation of the speedy trial provision thus need not await indictment, information, or other formal charge. But we decline to extend the reach of the amendment to the period prior to arrest. Until this event occurs, a citizen suffers no restraints on his liberty and is not the subject of public accusation: his situation does not compare with that of a defendant who has been arrested and held to answer. Passage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself. But this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context. Possible prejudice is inherent in any delay, however short; it may also weaken the Government's case. (*Id.* at 321–322, 92 S.Ct. at 463, 30 L.Ed.2d at 479)

The Court concluded its analysis of the Sixth Amendment's applicability by noting that the relevant statute of limitations is the primary mechanism for guarding against possible prejudice resulting from passage of time between a crime and arrest or charge:

There is thus no need to press the Sixth Amendment into service to guard against the mere possibility that pre-accusation delays will prejudice the defense in a criminal case since statutes of limitation already perform that function. (*Id.* at 323, 92 S.Ct. at 464, 30 L.Ed.2d at 480)

*Marion* thus would appear to foreclose any argument based on the Sixth Amendment raised by defendant Hess. Hess acknowledges that *Marion* limits the application of the speedy trial provision to an "accused," but he contends that he became an "accused" when the grand jury began investigating his affairs, and more certainly, when he was informed that he was a target of the grand jury's investigation. He contends that he has been prejudiced by the public knowledge of his status as one targeted by the grand jury investigation. Defendant contends that the Court should not consider *Marion* to be dispositive of defendant's claim because the Supreme Court did not address itself to the question of whether one who is named as a target of grand jury investigation becomes an "accused" for purposes of the Sixth Amendment.

If one examines the dissent in *Marion,* it is evident that the Supreme Court was faced with a situation similar to the one at bar and yet declined to apply the Sixth Amendment to the pre-indictment stage. The facts of the case are set forth in the dissent:

From March 15, 1965, to February 6, 1967, appellees acting through Allied Enterprises, Inc., sold and installed home intercom, fire control, and burglar protection devices in the District of Columbia metropolitan area. Their business endeavors were soon met with a spate of lawsuits seeking recovery for consumer fraud and, on February 6, 1967, their brief career was ended by a cease-and-desist order entered by the Federal Trade Commission. Public notoriety continued to surround appellees' activities and, in a series of articles appearing in the Washington Post in September and October of 1967, their business was mentioned as being under investigation by the United States Attorney. The special grand jury that was impaneled on October 9, 1967, to investigate consumer fraud did not, however, return an indictment against appellees. Sometime between the summer of 1968 and January 1969, appellees delivered their business records to the United States Attorney, but an indictment was not returned against them until April 21, 1970. The indictment charged some 19 counts of mail fraud, wire fraud, and transportation of falsely made securities in interstate commerce all between September 3, 1965, and January 19, 1966. (*Id.* at 326–327, 92 S.Ct. at 466, 30 L.Ed.2d at 482)

It was this set of facts that led the three dissenters to reason:

Undue delay may be as offensive to the right to a speedy trial before as after an indictment or information. The anxiety and concern attendant on public accusation may weigh more heavily upon an individual who has not yet been formally indicted or arrested for, to him, exoneration by a jury of his peers may be only a vague possibility lurking in the distant future. Indeed, the protection underlying the right to a speedy trial may be denied when a citizen is damned by clandestine innuendo and never given the chance promptly to defend himself in a court of law. Those who are accused of crime but never tried may lose their jobs or their positions of responsibility, or become outcasts in their communities. (*Id.* at 330–331, 92 S.Ct. at 468, 30 L.Ed.2d at 484)

Defendant, in effect, asks this Court to adopt the position of the dissent in *Marion,* but this the Court declines to do. The Court in *Marion* had before it a situation in which appellees were subjected to pre-indictment publicity for several years, and yet it did not hold that the publicity was enough to call into action the Sixth Amendment's speedy trial right. This Court is bound to follow the majority in *Marion* and hold that a defendant is not an "accused" until indictment or arrest.

In addition, two other courts have considered claims similar to those raised by defendant and rejected them. In *United States v. Handel,* 464 F.2d 679 (2nd Cir.), cert. denied, 409 U.S. 984, 93 S.Ct. 326, 34 L.Ed.2d 249 (1972), the court stated:

Of the remaining dangers commonly said to be safeguarded by the Sixth Amendment, appellant suffered from one only, anxiety at the knowledge he was the target of a criminal investigation. . . [citation to *Marion* omitted] In *Marion,* where the defendants had been exposed in the newspapers as the object of a purported criminal investigation three years before their indictment, anxiety or concern without a standing formal accusation was not deemed enough to invoke the Sixth Amendment. (464 F.2d at 680, n. 2)

The court in *United States v. Shafer,* 384 F.Supp. 480 (N.D.Ohio 1974), explained:

These same defendants press an argument that they had 'become accused' prior to formal indictment, by reason of the publicity surrounding the Kent State incident. This argument fails for two reasons. First, it stands in direct contradiction to the substance of defendants' Fifth

Amendment argument, that statements by Justice Department officials gave defendants no reason to believe they would ever be subjected to criminal prosecution for their actions at Kent State. Second, and more importantly, both the Supreme Court in *Marion, supra,* and the Second Circuit Court of Appeals, have rejected the claim that 'accused' status results from a defendant's mere 'anxiety at the knowledge he was a target of a criminal investigation.' *United States v. Handel,* 464 F.2d 679 (2nd Cir. 1972). (384 F.Supp. at 481)

This Court, therefore, holds that defendant Hess did not become an "accused" for purposes of the Sixth Amendment until he was indicted and that the speedy trial provisions of that amendment do not apply. Thus, the Court need not review defendant's analysis of the factors relevant to a speedy trial claim under *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

B. *Defendant's Fifth Amendment Right*

The Supreme Court in *Marion,* while foreclosing appellees' Sixth Amendment rights, concluded that pre-indictment delay might require dismissal on due process grounds:

Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. . . . [citations omitted] However, we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires dismissal of the prosecution. Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution. To accommodate

the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case. It would be unwise at this juncture to attempt to forecast our decision in such cases. (404 U.S. at 324–325, 92 S.Ct. at 465, 30 L.Ed.2d at 481; footnotes omitted)

Although the Supreme Court has made it clear that a defendant has a Fifth Amendment right to be free from prejudicial delay, the showing that a defendant must make before an indictment will be dismissed against him is far from clear. The courts are divided on whether a defendant must show *both* an unreasonable delay intended by the government to gain a tactical advantage over the accused *and* actual prejudice to a defendant's right to a fair trial or whether it is sufficient for a defendant to show *either* of these elements.

In *Hamilton v. Lumpkin,* 389 F.Supp. 1069 (E.D.Va.1975), a habeas corpus proceeding, the court held that a defendant who can show either of the elements is entitled to relief. The court reasoned:

Since *Marion,* at least one court has suggested that 'it is unclear from the opinion whether a successful claim under the due process clause must establish both actual prejudice and intentional delay on the part of the Government or whether a showing of the former alone would be sufficient.' *United States v. Iannelli,* 461 F.2d 483, 485, n. 2 (2d Cir. 1972), *cert. denied,* 409 U.S. 980, 93 S.Ct. 310, 34 L.Ed.2d 243 (1972). This Court, however, finds nothing in *Marion* other than the mere concession by the government to create such uncertainty. Nor, for that matter, does the Court concur in the view expressed by the state trial court in denying petitioner's motion to quash that *Marion* must be read as calling for dismissal of a prosecution only if both deliberate delay and actual prejudice are shown. Rather, this Court concludes that a valid due process claim on the basis of pre-accusation delay can be established in either of two ways.

First, the Court believes that a valid due process claim is made out by a showing that the state intentionally chose to delay apprising a defendant of the charges for which he stands accused. In the Court's view, such a situation is analogous to the state's knowing use of perjured testimony, *see Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), or its suppression of exculpatory evidence following a defendant's request for such material, *see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in that this casting of 'the prosecutor in the role of an architect of a proceeding . . does not comport with standards of justice.' 373 U.S. 88, 83 S.Ct. 1197. While, in the instant matter, the Court finds the record void of evidence to substantiate a finding of such an abuse of prosecutorial discretion, this does not put an end to the Court's inquiry into the merits of petitioner's claim. For, even in the absence of such a showing, the Court concludes that a valid due process claim is established by demonstrating that the petitioner has suffered actual prejudice to his defense. *United States v. Giacalone,* 477 F.2d 1273 (6th Cir. 1973); *United States v. Golden,* 436 F.2d 941 (8th Cir.), *cert. denied,* 404 U.S. 910, 92 S.Ct. 236, 30 L.Ed.2d 183 (1971); *United States v. Baker,* 424 F.2d 968 (4th Cir. 1970). (389 F.Supp. at 1075).

It is interesting to note that at approximately the same time as the decision in *Hamilton v. Lumpkin, supra,* a federal district court in Pennsylvania reached the opposite conclusion. In *United States v. Frumento,* 405 F.Supp. 23 (E.D.Pa.1975), the court stated:

> While some cases in this circuit have indicated that the requisite proof to make out such a violation is *either* that the pre-indictment delay caused substantial prejudice to the defendant's right to a fair trial *or* that the delay was an intentional prosecutorial device to gain tactical advantage over the accused or to harass him . . . [citations omitted], this Court believes that the language in *United States v. Marion, supra,* requires a showing of both elements before an indictment will be dismissed on due process grounds. . . . [citations omitted]
>
> In a criminal proceeding, the constitutional guarantee of due process embodies '. . . that fundamental fairness essential to the very concept of justice.' *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). It is the most basic, and yet the least procedurally precise, of the constitutional limitations on the ability of the Government to prosecute an individual. This Court does not believe, in the absence of a showing of prosecutorial misconduct, that it is fundamentally unfair to a subsequently-indicted defendant that he suffers some actual prejudice to his defense from a delay in the Government's seeking of his indictment which does not exceed the applicable statute of limitations. We believe a stricter standard would place an unfair burden of responsibility on the prosecution for pre-indictment delays over which it frequently has no control. The Supreme Court recognized this fact in *United States v. Marion, supra,* 404 U.S. at 324–325, 92 S.Ct. at 465, when it stated: 'Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution.' (405 F.Supp. at 28)

This Court finds it is unnecessary to decide this issue since defendant has failed to show either actual prejudice or intentional prosecutorial delay. Only if defendant could show one of these elements would it be necessary for the Court to decide if he need show them both.

The Court will first consider whether defendant has made out a showing that the government intentionally delayed the return of the indictment to gain a tactical advantage. Defendant alleges that the government is responsible for leaking information which contributed to the "steady stream" of publicity. This allegation, even if it could be supported by facts, is not

relevant to the question of whether the government delayed the return of the indictment unreasonably and for tactical reasons. The existence of publicity has no bearing on the period of time necessary for proper investigation. Defendant's only allegation in that regard is as follows:

> The manner in which the Government conducted the investigation which culminated in the indictment of Mr. Hess is strongly suggestive of the prosecutorial gamesmanship condemned by a number of courts . . . . Rather than investigating and moving to indict Mr. Hess with all deliberate speed, the prosecutors chose instead to take almost two years to indict Mr. Hess. (Motion, p. 7)

The conclusory allegation of defendant that the government did not proceed with all deliberate speed is not sufficient to make out a claim of abuse of prosecutorial discretion. In *United States v. Griffin,* 464 F.2d 1352 (9th Cir.), *cert. denied sub nom. Montano v. United States,* 409 U.S. 1009, 93 S.Ct. 444, 34 L.Ed.2d 302 (1972), the court stated:

> Although the appellants charge that the 'delay in the case at bar was inordinate . . . and unjustified,' they fail to set forth anything other than bald conclusions which might even approach the possibility that the government's purpose was to gain a tactical advantage over them. In short, the appellants' conclusory allegations are without persuasion that they have been denied the right to due process. (464 F.2d at 1355)

■ Second, the defendant has not shown that he has been prejudiced by the alleged delay. Hess argues that he has been prejudiced, first, by the publicity and, second, by "faded memories and lost evidence." (Motion, p. 8) The Court has previously held, in its ruling on the Motion for Change of Venue, that a determination of the effect of publicity on potential jurors must await voir dire. Defendant has not demonstrated that any actual prejudice to the preparation of his defense has resulted from the publicity. Further, if it be determined at voir dire that all potential jurors

have been adversely affected by the publicity, then the remedy is change of venue and not dismissal of the indictment. Defendant Hess was, in fact, one of the defendants who moved for change of venue.

■ Nor is it enough for defendant simply to state that the eventual presentation of his defense will be inhibited by faded memories and lost evidence. By his own admission, defendant was formally notified of the investigation in April 1974, and his counsel was informally notified in January 1974. Thus, defendant has been on notice of possible indictment and has had the opportunity to preserve any records necessary and to take other steps to prevent loss of evidence or faded memories. The court in *United States v. Moore,* 378 F.Supp. 990 (E.D.Pa.1974), stated:

> A delay in prosecuting a defendant for a year after the offense does not constitute prejudice per se. . . . [citations omitted] This is particularly true since defendant knew he was the subject of an investigation. (378 F.Supp. at 991)

In *United States v. Shafer, supra,* the court considered defendants' claims of prejudicial delay:

> While the Supreme Court has not, as yet, made it clear whether a defendant must prove that pre-indictment delay was 'intentional,' as well as 'actually prejudicial,' . . . such an inquiry becomes necessary only if 'actual prejudice' is found. . . . While the political delays alleged by defendants might constitute the equivalent of 'intentional delay' necessary to meet that portion of the *Marion* test, this factor is made irrelevant by the failure of defendants to demonstrate the required actual and substantial prejudice.
>
> In *Marion* and, thereafter, in numerous Courts of Appeals, it was made painfully clear that merely potential prejudice as opposed to actual and substantial demonstrated prejudice is insufficient to invoke Fifth Amendment due process protections. . . . (384 F.Supp. at 482)

The court in *Shafer* reviews the holdings of several Courts of Appeals and then turns to a consideration of the facts before it. Its

discussion of those facts could very well apply to the case of defendant Hess. The court states:

> In the instant case, neither group of defendants has ever alleged the sort of actual and substantial prejudice required by *Marion* to dismiss the indictment for pre-indictment delay by the government. On the contrary, repeating the very language which has frequently been held by the courts to be insufficient, defendants claim that 'memories have faded' and that 'the delay works a hardship on them that may prove impossible to overcome.' Defendants claim that, 'physical evidence which may have existed immediately subsequent to the time of the incidents is no longer available,' without specifying what evidence, why it would have been helpful to defendants' defense, or how its destruction is related to the delay. The blanket assertion that, 'obviously, with the passage of such a long time recollection and testimony fade and evaporate, documents may be lost,' will not support a dismissal of indictments due to pre-indictment delay.
>
> In addition, defendants would be particularly hard-pressed to demonstrate actual prejudice in this case, due to the extraordinary extent to which pretrial discovery has been ordered. Defendants have obtained access to virtually all of the investigatory reports and material unearthed by the government in its initial investigations, and are thus placed on an essentially equivalent footing with the government at the time of trial. (*Id.* at 482–483)

As in *Shafer*, defendant's claim of lost evidence and faded memories is far from sufficient to demonstrate actual prejudice. Here, too, defendant has had access to all of the materials to which he is entitled under Rule 16(a)(1)(C) of the F.R.Crim.P.

Although defendant has not requested an evidentiary hearing in support of his motion, the Court will not on its own motion order such a hearing. As the court stated in denying defendants' motion for such a hearing in *Shafer*:

> Such a hearing is appropriate only after a defendant specifically alleges facts, witnesses, or documents which have become unavailable due to the delay, and which would have been of material value to his defense. Such a hearing then allows the defendant to demonstrate the alleged force of the testimony at trial, and the nexus of the alleged prejudice with the delay. (*Id.* at 483)

In holding that the defendant has not made a sufficient showing of deliberate delay or actual prejudice, the Court is not holding that there was in fact any delay in this case. The Court is unable to make that determination on the facts before it. Nor is it necessary that the Court do so for it has held that, assuming there was delay, the defendant is not entitled to dismissal of the indictment on either Fifth or Sixth Amendment grounds.

 The Court notes in this regard that the complexity of the case in an important consideration in determining whether there has been unreasonable delay in the return of the indictment. In *United States v. De-Masi,* 445 F.2d 251 (2nd Cir.), *cert. denied,* 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971), the defendant was indicted for violations of the Hobbs Act almost four years after the crime was committed. The court held that the delay was not prejudicial, stating in part:

> Although the constitutional and social imperatives in the speedy trial concept are deeply embedded in our jurisprudence, nonetheless we have also recognized that careful investigation, even at the price of delay, is to be cherished, inasmuch as '[t]ime-consuming investigation prior to an arrest minimizes the likelihood of accusing innocent parties and may facilitate the exposure of additional guilty persons.' (445 F.2d at 255)

In *United States v. MacClain,* 501 F.2d 1006 (10th Cir. 1974), defendant was convicted on five counts of securities and mail fraud. A thirty-nine month delay was involved there. The court stated:

> All MacClain can point to is the length of time, which is not unreasonable in view

of the fact that a complex mail fraud/securities fraud case such as this calls for extensive and careful preparation and organization. . . . (501 F.2d at 1010)

Finally, in *United States v. Feinberg*, 383 F.2d 60 (2nd Cir. 1967), *cert. denied*, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968), the court considered the role of the courts in ruling on pre-indictment delay:

It would be unwise to impose upon the judiciary the inquisitorial function of scrutinizing the internal operations of law enforcement agencies when no possible prejudice to the accused has been shown. Acceptance of the proposition advanced by appellant would encourage hasty, less efficient investigation and premature deprivations of freedom, curtail the investigation of organized crime, and lodge with enforcement agencies the procedural onus of recording in detail every event in the investigative process. In short, fear of forfeiting a prosecution would frequently induce *unreasonable* speed which 'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.' . . . (383 F.2d at 67)

For the reasons stated in *Feinberg, supra,* this Court would hesitate to hold that the government took an unreasonable amount of time to return an indictment in the absence of clear and convincing evidence to that effect.

## C. *Conclusion*

After consideration of defendant's claims, based on both the Fifth Amendment and the Sixth Amendment, the Court holds that defendant is not entitled to dismissal of the indictment on the basis of prejudicial pre-indictment delay or of government-inspired delay. Thus, defendant's motion to dismiss on the basis of pre-indictment delay must be denied.

## IV. *Publicity before the Grand Jury*

The Court will now consider defendant's contention that the indictment should be dismissed because massive pre-indictment publicity prejudiced the grand jury in its deliberations. Defendant cites no facts in support of his contention that publicity prejudiced the grand jury but assumes from the publicity itself that such prejudice must have existed. The government notes this absence of a specific showing of grand jury bias and argues that defendant has not met his burden of demonstrating some specific reason to believe that the grand jury was biased in his case and thus failed to perform its duty.

The Court will begin its analysis with the following comment from 8 J. Moore, *Federal Practice-Criminal Rules* ¶ 6.03[4], at 6–42.3 (2d ed. 1965):

Occasionally an indictment is attacked on the ground that it was induced by prejudicial publicity, an argument more commonly raised as an issue of fair trial. It does not appear that any indictment has thus far been dismissed on this ground.

The courts that have considered the question have held that a defendant must show not only that there was publicity but also that such publicity caused prejudice and bias in the grand jurors and that the indictment returned was the result of essential unfairness. *See United States v. Anzelmo,* 319 F.Supp. 1106, at 1113–1114 (E.D.La. 1970), and cases cited therein. In *United States v. Hoffa,* 205 F.Supp. 710 (S.D.Fla.), *aff'd sub nom., Hoffa et al. v. Lieb,* 371 U.S. 892, 83 S.Ct. 188, 9 L.Ed.2d 125 (1962), defendants were indicted for violation of mail and wire fraud statutes and for conspiracy and moved to dismiss the indictment on the basis of pre-indictment publicity. The court denied the motion, reasoning:

While it is without doubt true that the defendant, Hoffa, and his activities were, and are, constantly subject to widespread publicity, and while it must also be admitted that some of that publicity is less than complimentary to Hoffa, this proof falls far short of establishing that this grand jury was, in fact, prejudiced and biased against him. Specific showing of prejudice is necessary to vitiate the indictment, and the evidence is totally devoid of any such proof. . . .

To accept the contention urged by the defendants as a rule of law certainly would produce absurd results since no one who is prominent and well known could be charged with the commission of any crime because the charge against such a person no doubt would cause very large and widespread adverse publicity, precluding an indictment. (205 F.Supp. at 717)

Similarly, in *United States v. Dioguardi,* 20 F.R.D. 33 (S.D.N.Y.1956), defendant claimed that the indictment should be dismissed or venue changed due to massive publicity arising from an alleged acid-throwing attack on a newspaper columnist. Defendant further charged that the United States Attorney engendered the sensational news exploitation. The court stated in denying both motions:

To the extent that 'trial by newspaper' was indulged in by Federal law-enforcement officials, it is to be regretted and condemned. But the issues raised by the defendant's motion require an examination into the existence and prejudicial effect of the publicity, rather than into its source and inspiration.

The motion to dismiss is based on the proposition, be it one of law or fact, that the deliberations of the grand jury must have been tainted by the flood of prejudicial publicity. . . . But for a rule of law that a grand jury cannot hand down a valid indictment because of publicity charging the atmosphere, more direct and explicit authority is required. Nor am I willing to 'suppose', assume or conjecture, as a matter of fact, that the grand jury deliberations were so infected as to invalidate the indictment; although it must be added, in all fairness, that such a supposition would do little violence either to the conscience or the imagination. (20 F.R.D. at 34–35)

The court in *United States v. Garrison,* 353 F.Supp. 306 (E.D.La.1972), considered and denied a motion to dismiss the indictment raised by defendant Garrison, the District Attorney for the Parish of Orleans, who had been charged with making false income tax returns. The court emphasized the importance of showing actual prejudice:

Merely citing the publicity falls far short of establishing that the grand jury here was, in fact, prejudiced against him. Specific showing of prejudice is necessary to vitiate the indictment and no such showing has been made.

To accept Garrison's contention that merely because there was publicity (for some of which he was himself responsible) the grand jury was so prejudiced and biased that it did not give fair and impartial consideration to the matters presented to it would require a finding, without evidence in support thereof, that the grand jurors completely ignored the evidence presented to them and violated their oaths.

Absent the required specific showing of prejudice, to apply Garrison's contention as a rule of law would produce absurd results. In such a case no persons, who may be prominent and well known or who may be elected officials, whether popular and established, as defendant contends he is, or not, could be charged with the commission of any crime because doubtlessly the fact of charging would cause unfavorable pre-indictment publicity, thus precluding indictment or vitiating one found by a grand jury. (353 F.Supp. at 310)

The courts note, among other things, the importance of charging prominent persons with the commission of crimes and the strong presumption of regularity that surrounds grand jury proceedings in denying motions to dismiss the indictment and requiring defendants to show actual grand jury bias. Several courts have compared the role of the grand jury with that of the petit jury, concluding that the grand jury is more free to consider all types of matters in bringing indictments than the petit jury. The court in *United States v. Nunan,* 236 F.2d 576 (2nd Cir. 1956), *cert. denied,* 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 860 (1957), reasoned:

As the various disclosures brought to light by the King Committee affected

some of the highest ranking officials in the Internal Revenue Service, including appellant [who had been Commissioner of the I.R.S.], it was inevitable that the resulting publicity would be sensational in character, and much of it was unfair, misleading, and, at least to some extent, untrue and unwarranted. But we are not dealing here with alleged bias or prejudice by a petit jury, caused by widespread publicity during or just prior to a trial of the issues. . . . In such a situation much would depend upon the character of the publicity, proof that it was of such a nature as to be likely to make an impression on the jurors, and the steps taken by the trial judge to mitigate or remove its effect. . . .

But a Grand Jury is not confined to a passive role, but may and often should proceed on its initiative. . . . That it is induced to such an action by newspaper reports forms a continuum with its historic function of ferreting out crime and corruption, and is in no way inconsistent with its duty to decide on and in accordance with the evidence before it. . . . (236 F.2d at 593)

The court concluded:

Accordingly, we cannot say that appellant has overcome the strong presumption of regularity accorded to the deliberations and findings of grand juries . . or that the district judge abused his discretion in denying the motion to quash. (*Id.* at 594)

The court in *Silverthorne v. United States,* 400 F.2d 627 (9th Cir. 1968), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971), also considered the role of the grand jury. That case involved a criminal prosecution and conviction of misapplication of bank funds and making false entries in bank records. The court reversed the conviction on the basis of pre-trial publicity resulting from the occurrence of Senate hearings involving the appellant at the same time as the trial, holding that the trial court's voir dire examination did not adequately dispel the probability of prejudice. The court also held the district court properly denied appellant's motion to dismiss the indictment:

We have no way of knowing what effect the news-media reporting had on the grand jurors. Even had the district court permitted the appellant to inspect the grand jury minutes we are unable to see how the written transcript could have afforded counsel or the trial judge any basis for the objective assessment of the existence of prejudice toward appellant in the minds of the grand jurors.

. . . . .

Our conclusion that appellant was not prejudiced by grand jury indictment is further supported by the fact that the grand jury deliberates and indicts, as an accusing body, on the standard of 'reasonable probability' that a crime has been committed by some person. It is not a trial body. . . . The quantum of evidence necessary to indict is not as great as that necessary to convict. If a grand jury is prejudiced by outside sources when in fact there is insufficient evidence to indict, the greatest safeguard to the liberty of the accused is the petit jury and the rules governing its determination of a defendant's guilt or innocence. And, if impartiality among the petit jurors is wanting, the cure is reversal by the appellate courts. (400 F.2d at 633–634)

██ ██ The courts have imposed a heavy burden on a defendant seeking dismissal of an indictment on the basis of prejudicial publicity and resultant grand jury bias for several reasons evident from the above cases. First, there is a presumption of regularity surrounding grand jury proceedings, as well as a practice of maintaining the secrecy of grand jury deliberations. Second, if pre-indictment publicity could cause the dismissal of an indictment, many persons, either prominent or notorious, could readily avoid indictment, a result detrimental to the system of justice. Third, the role of the grand jury historically has differed from that of a petit jury and the same freedom from outside influences is not required. The Court agrees that these are

important considerations and sees no reason to depart in the instant case from the requirement that actual prejudice be shown before an indictment will be dismissed.

It is possible that in a proper case the Court would dispense with the requirement of actual prejudice. Such a case could arise when it is clear that a substantial amount of publicity is inspired by the prosecution. In *United States v. Sweig,* 316 F.Supp. 1148 (S.D.N.Y.1970), aff'd, 441 F.2d 114 (2nd Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971), the court concluded that such an exception to a showing of actual prejudice might exist:

It has indeed been common in past cases to reject motions of the general kind here in question for failure to show actual 'prejudice' resulting from pre-indictment publicity. . . . [citations omitted] But such rulings, perhaps reflecting the nearly impenetrable armor traditionally protecting indictments, have tended. to prescribe a test normally impossible of fulfillment. The secrecy of the grand jury's work, usually preserved in large measure at least until or after the trial, is a barrier to even an attempted showing of prejudice. It has sometimes seemed, therefore, that attacks upon indictments because of prejudicial publicity were inevitably doomed as a matter of law. There have, nevertheless, been intimations before now that the case of prosecution-inspired publicity might be different. . . . (316 F.Supp. at 1153–1154)

The court in *Sweig* did not, however, define precisely how the case of prosecution-inspired publicity might be "different" because it held that defendants had offered no substantial proof that the government was the source of the publicity:

Taking all the materials together, defendants have failed to present a concrete basis for inferring that government officials were responsible in any substantial degree for the unquestionably considerable amount of publicity preceding the indictment. . . . The unspecified 'sources' mentioned in the newspaper stories defendants cite are nowhere particularized. Granting that the particularization is no simple matter, especially in view of the care journalists exercise to preserve the confidentiality of their sources . . . ., the circumstances do not now justify an evidentiary hearing to test on this asserted ground the validity of the indictment. (*Id.* at 1155)

 This Court, too, finds that defendant has failed to present a concrete basis for inferring that government officials were responsible for a substantial amount of the publicity. Thus, there is no need for the Court to consider what procedure it would follow if it could be shown the publicity was prosecution-inspired and no need for the Court to deviate from the well-accepted rule that a defendant must show actual grand jury bias before an indictment against him will be dismissed.

Before concluding, the Court notes two other cases often cited for the proposition that actual grand jury bias must be shown. *Gorin v. United States,* 313 F.2d 641 (1st Cir. 1963), cert. denied, 379 U.S. 971, 85 S.Ct. 669, 13 L.Ed.2d 563 (1965), involved a prosecution on a charge of conspiring to bribe and bribing an internal revenue agent and of conspiring to defraud the United States in its governmental functions. Before trial appellants moved to dismiss the indictment because it had been returned by grand jurors calculatedly prejudiced against them by government-inspired publicity. The court denied the motion.

In *United States v. Kahaner,* 204 F.Supp. 921 (S.D.N.Y.1962), aff'd, 317 F.2d 459 (2nd Cir. 1963), the court denied defendant's motion to dismiss, stating:

It must be presumed that the grand jury followed the court's instructions as to its powers, duties and obligations and that each grand juror fully lived up to and observed his solemn oath. Indeed there is a strong presumption of regularity to the deliberations and findings of grand juries. (204 F.Supp. at 923)

 After extensive review of the above cases and of others, as well as of the arguments in the briefs of both parties, the Court holds that defendant Hess has failed

to make the requisite showing of actual grand jury bias necessary to provide sufficient grounds for dismissal of the indictment. Therefore, defendant's motion to dismiss must be denied.

## V. *Conclusion*

The Court has considered defendant's two grounds for dismissing the indictment. Concerning the allegations of pre-indictment delay, defendant has not met the burden of establishing actual prejudice resulting from the delay or of showing that the delay was a deliberate prosecution-inspired tactical move meant to put the defendant at a disadvantage. Nor has defendant supported his charge of grand jury bias with any showing of actual bias. It is true that the defendant in moving for dismissal of an indictment bears a heavy burden, but the policy reasons of thorough investigation before indictment and of grand jury secrecy necessitate such a burden. Therefore, the Court must deny defendant Hess' motion to dismiss the indictment. This motion is also denied as to the other defendants who adopted this motion.

Accordingly, it is this 5th day of April, 1976, by the United States District Court for the District of Maryland,

*ORDERED*:

That the motion to dismiss the indictment of defendant W. Dale Hess be, and the same hereby is, *Denied.*

## MEMORANDUM AND ORDER DENYING CHANGE OF VENUE

Defendants W. Dale Hess, Harry W. Rodgers, III and William A. Rodgers have moved jointly for a change of venue pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure. The Court heard oral argument on this motion on March 24, 1976. Rule 21(a) provides as follows:

(a) *For Prejudice in the District.* The court upon motion of the defendant shall transfer the proceeding as to him to an-other district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

In support of their motion, defendants have submitted to the Court four volumes of newspaper clippings from newspapers circulating in Maryland and in the District of Columbia metropolitan area, a summary of these clippings and sample headlines. Defendants contend that the publicity is so extensive and prejudicial in Maryland and the surrounding area that the Court should grant a change of venue to the Western District of Virginia in Roanoke, Virginia.[1]

Defendants also contend that, since the indictment charges them with engaging in a scheme to defraud the citizens of Maryland, a trial in Maryland would mean that the defendants would be tried before a jury composed of the victims of their alleged wrongdoing, thereby denying them a fair trial.

The Court will consider both of these arguments below.

## I. *Publicity*

Motions for change of venue on the basis of pretrial publicity have frequently been considered by the courts. The basic question is whether a court can determine the necessity for change of venue before voir dire examination of prospective jurors or whether a court must first resort to voir dire. The rule has developed that only in the most extreme cases of prejudicial publicity is a court permitted to order a change of venue before voir dire. The question in each case must be, therefore, whether or not such extreme circumstances exist. The Court will turn first to the Supreme Court opinions that have considered the question.

1. Defendants in their motion suggest the Western District of Virginia. However, at oral argument defendants requested that, if the Court grants a change of venue, they be permitted to argue at that point the proper district for the change. Defendants suggested Norfolk, Virginia, and Raleigh, North Carolina, as additional possibilities.

### A. *Supreme Court Decisions*

Only in rare situations of extensive and extremely prejudicial pretrial publicity has the Supreme Court ordered reversal of criminal convictions. Defendants rely on four such cases in support of their motion. The first is *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), a habeas corpus proceeding by a state prisoner to test the validity of his conviction for murder and sentence of death. In that case, six murders were committed, and the crimes were intensively covered by the news media in the locality. When the petitioner was arrested, the police issued press releases, which were greatly publicized, stating that the petitioner had confessed to the six murders. The press in *Irvin v. Dowd* was clearly biased against the petitioner, unleashing a barrage of inflammatory newspaper headlines, articles, cartoons and pictures for six or seven months preceding the trial. The stories in the press and on television and radio revealed details of petitioner's background, including a reference to crimes committed when a juvenile, his convictions for arson almost twenty years previously, for burglary and by a court-martial on AWOL charges during the war. In many of the stories petitioner was described as the "confessed slayer of six," a parole violator and fraudulent-check artist. (*See* 366 U.S. at 725–726, 81 S.Ct. at 1644, 6 L.Ed.2d at 757–58 for a complete description of the publicity.) It was this extensive and highly prejudicial publicity which led the Supreme Court to hold a writ of habeas corpus should issue.

The second case is *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). The defendant in *Rideau* was convicted of murder, and the court reversed his conviction, holding that the trial court's refusal to grant a change of venue was a denial of due process. A film with a sound track had been made of an interview in jail between the sheriff and the defendant in which the defendant admitted in detail the commission of the robbery, kidnapping, and murder in response to leading questions by the sheriff. The film was televised three times to tens of thousands of people in the parish where the trial was to take place two weeks before the arraignment and two months before the trial.

The third case is *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). The defendant was convicted of swindling. The court held that the defendant was deprived of due process by the televising of his notorious, heavily publicized, and highly sensational trial. The court stated that the actual effect of the practice, in that case televising, need not be examined if prejudice is inherent in that practice:

> It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process. (381 U.S. at 542–543, 85 S.Ct. at 1632, 14 L.Ed.2d at 550)

The final case is *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), in which the Supreme Court held that the failure of the state trial judge in a murder prosecution to protect the defendant from inherently prejudicial publicity which saturated the community and to control the disruptive influences in the courtroom deprived the defendant of a fair trial. The prejudicial practices are noted in detail in the court's opinion and will not be repeated here. Basically, the press took over the trial and was granted many privileges by the trial judge. As the court noted:

> We agree, as did the Court of Appeals, with the findings of Judge Bell's opinion for the Ohio Supreme Court:
>
> 'Murder and mystery, society, sex and suspense were combined in this case in such a manner as to intrigue and captivate the public fancy to a degree perhaps unparalleled in recent annals. Throughout the preindictment investigation, the subsequent legal skirmishes and the nine-week trial, circulation-conscious editors catered to the insatia-

ble interest of the American public in the bizarre. * * * In this atmosphere of a "Roman holiday" for the news media, Sam Sheppard stood trial for his life.' [*State v. Sheppard*] 165 Ohio St. [293], at 294, 135 N.E.2d [340], at 342.

(384 U.S. at 356, 86 S.Ct. at 1519, 16 L.Ed.2d at 616)

The court further established the "reasonable likelihood" standard for granting a change of venue:

> Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances. Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. But where there is a *reasonable likelihood* that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity. (*Id.* at 362–363, 86 S.Ct. at 1522, 16 L.Ed.2d at 620; emphasis supplied)

These four Supreme Court cases increased the concern of the courts with the effects of pretrial publicity. The publicity in subsequent cases is usually measured against that present in those four cases. As will be discussed below, the law has developed that the trial court has two alternatives. One, if it appears that the publicity is "inherently prejudicial," the court need not await demonstration of actual prejudice and may grant a change of venue without resorting to voir dire. Two, if the publicity does not rise to the level of being "inherently prejudicial," then the court should await voir dire before determining if venue should be changed.

**B. *Voir Dire***

The critical question before the Court is basically one of timing—should the Court await voir dire or not? Defendants contend that the Court need not await voir dire before ordering a change of venue under the circumstances of this case. They argue that this case presents a situation in which the community is saturated by inherently prejudicial publicity and therefore a motion for change of venue should be granted prior to voir dire.

The government contends that defendants must show that the publicity has in fact generated prejudice against them and that such a showing must logically await voir dire examination because, in the absence of extreme circumstances, a claim of prejudice from pretrial publicity remains speculative until factually demonstrated by inability to pick an impartial jury.

It appears to the Court that the defendants and the government agree on the law involved in granting a change of venue but dispute the character of the publicity involved. Both parties agree that a court should normally await voir dire but that in cases of inherently prejudicial publicity a court may grant a change of venue before voir dire. What remains is a dispute over the quality of the publicity involved. Defendants contend it is inherently prejudicial while the government maintains it is not.

The Court agrees with both defendants and the government that it has the authority to grant a change of venue prior to voir dire when the publicity is inherently prejudicial. It also agrees that, if the publicity is not inherently prejudicial, it must await voir dire before ruling on a motion for change of venue. Several cases in the Fourth Circuit support the Court's interpretation of the law. The most recent case is *United States v. Abbott Laboratories,* 505 F.2d 565 (4th Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 671 (1975). There, a prosecution was instituted for causing the introduction into interstate commerce of adulterated and misbranded intravenous drugs. The district court dismissed the indictment because of prejudi-

cial pretrial publicity in releases emanating from the special prosecutor, the Department of Justice and the Food and Drug Administration. It also dismissed the indictment because the grand jury considered prejudicial and inflammatory information not relevant to its inquiry, which caused it to be biased in derogation of the constitutional rights of the defendants. The Court of Appeals reversed and remanded, holding that dismissal of the indictment was too drastic a remedy for what misconduct on the part of the government had occurred and that the challenged evidence considered by the grand jury was relevant to its investigation and proper to be considered by it.

The court began by stating that it accepted, without question, that the pretrial publicity was "prejudicial and highly inflammatory." (505 F.2d at 570) The court held that, even though the publicity was prejudicial and inflammatory, the court must first resort to voir dire before dismissing the indictment. The court distinguished *Rideau, supra,* as follows:

In *Rideau,* prejudice was committed by pretrial disclosure of the most persuasive evidence of guilt—the defendant's own confession. Here, the prejudice may have affected the purity of the jury's fact-finding process, but it was not direct evidence of guilt, nor even evidence, necessarily admissible at trial. It is not inconceivable that prospective jurors, previously exposed to the publicity, had forgotten it; . . . or, remembering it, could truthfully and persuasively answer on voir dire that they would be unaffected in their deliberations by their recollection. . . . In sum, we hold that, although in a proper case *Rideau* may not require resort to voir dire and proof of the results thereof as proof essential to a finding that a defendant may not receive a fair trial so as to warrant dismissal of an indictment, such proof is essential in the instant case. Consequently, the district court's finding that a fair trial was impossible and its legal conclusion that the indictment should be dismissed cannot stand, since voir dire was not employed. (505 F.2d at 572)

As the defendants contend, the court in *Abbott* did not deal specifically with change of venue. The court did state that change of venue "in many instances" is resorted to only after voir dire:

Change of venue is a recognized device to overcome pretrial prejudicial publicity because it is not unreasonable to assume that pretrial publicity may receive less dissemination elsewhere than in the jurisdiction in which charges are lodged, or, even if it receives the same degree of dissemination elsewhere, that its prejudicial effect is less than in the jurisdiction where it has special local interest. In many instances change of venue is resorted to only after voir dire establishes that the inability to obtain a fair trial as a result of pretrial publicity exists. (*Id.* at 572)

The importance of *Abbott* to the Court's consideration of change of venue is that it expresses the view of the Court of Appeals of this circuit that voir dire can be an effective protection against prejudicial publicity. The court in *Abbott* refers to *Wansley v. Slayton, infra,* and states that in that case it "expressed confidence in the efficacy of voir dire examination as a protection against prejudicial publicity." (*Id.* at 571) This confidence is further evident in the *Abbott* holding that a court should resort to voir dire before dismissing an indictment for prejudicial publicity. Thus, although *Abbott* does not refer specifically to change of venue as part of its holding, this Court finds *Abbott* persuasive authority for the proposition that a court should first resort to voir dire when a change of venue is sought.

In *Wansley v. Slayton,* 487 F.2d 90 (4th Cir. 1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974), the court held that the trial court's refusal to grant a change of venue did not deny due process. The court stated:

It is well established that due process requires that an accused receive a trial by a fair and impartial jury 'free from outside influences'; and if there has been publicity which, by reason of its impact

on the jury, raises the 'reasonable likelihood' or probability that the accused has been prejudiced in his right to a fair trial, the trial court is obligated to take appropriate steps to determine whether in fact the accused can secure under the circumstances a fair trial. Whether there has been such prejudicial publicity requiring action by the Court is to be determined by an evaluation of 'the totality of the surrounding facts' in the matter. Ordinarily, under such a rule, the evaluation will be based both on the pre-trial publicity complained of and on its impact, if any, on the jury, so developed through adequate *voir dire* examination of the jurors. (487 F.2d at 92–93)

In a very recent Fourth Circuit case, the court made it clear that voir dire is important in ruling on change of venue. In *United States v. Jones,* No. 73–2520 (4th Cir., filed Feb. 9, 1976), the defendant moved for a continuance on the basis of pretrial publicity. The court stated:

Save in that rare case where there is a showing of 'inherently prejudicial publicity which has so saturated the community, as to have a probable impact on the prospective jurors'—which is certainly not this case—the trial court's primary responsibility in dealing with allegedly prejudicial pre-trial publicity—whether in connection with a motion for continuance or for a change of venue—is whether, as a result of such publicity, it is reasonably likely that the defendant can secure a fair and impartial trial. . . . It accordingly was not sufficient, as a basis for a motion for a continuance on this ground, to allege simply adverse publicity 'without a showing that the jurors were biased thereby.' . . . And the proper manner for ascertaining whether the adverse publicity may have biased the prospective jurors was through the voir dire examination. (slip opinion at 3–5; citations omitted)

In *United States v. Milanovich,* 303 F.2d 626 (4th Cir. 1962), an earlier Fourth Circuit case on this subject, the court considered the case of a defendant convicted of larceny. The prosecutor had told a radio station of the defendant's past record. The court stated:

Whenever it appears that shortly before a trial public news media in the community have published incompetent and prejudicial information about the case or the defendant, a duty devolves upon the trial court to make certain that the necessary conditions of a fair trial have not been impaired. Prospective jurors should be closely examined to determine whether they have been exposed to the improper information, and, if so, whether they can lay aside what has been heard in reaching a verdict. . . . If the prosecutor, an officer of the court, is implicated in the dissemination of such information, the occurrence should be scrutinized with special concern. . . . If the publication is shown to have reached the prospective jurors, they should be excused if there is any doubt about their partiality. (303 F.2d at 629)

See also *United States v. Sawyers,* 423 F.2d 1335 (4th Cir. 1970) and *United States v. Morlang,* 531 F.2d 183, No. 74–2071 (4th Cir. 1975).

From a review of the above cases, the Court concludes that the law in the Fourth Circuit is that a trial judge must first resort to voir dire before granting a change of venue, unless the publicity in the case is of a character that can be termed "inherently prejudicial." This is also the law in other circuits, and the Court will now note several cases from other circuits that are particularly helpful to the disposition of the instant motion.

*Calley v. Callaway,* 519 F.2d 184 (5th Cir. 1975), *petition for cert. filed,* 44 U.S.L.W. 3346 (U.S. Nov. 28, 1975) (No. 75–773), involved an army officer who had been convicted by court-martial of premeditated murder and assault with intent to commit murder, arising out of incidents that took place in Vietnam. He sought a writ of habeas corpus, alleging that he could not get a fair trial because of pretrial publicity. The district court granted the writ, and the Court of Appeals reversed.

After reviewing the extensive pretrial publicity in *Calley*, the court stated that it was error for the district judge to *assume* that exposure to publicity alone made it impossible for the court members not to be improperly influenced. The court stated that there have been a few cases which have equated pretrial exposure with prejudice but that the case before it was not such a case. (519 F.2d at 209) The court reviewed the voir dire conducted at trial and concluded that there was no likelihood that pretrial publicity so prejudiced the petitioner that he was denied a fair trial.

A second case to be noted is *United States v. Chapin*, 169 U.S.App.D.C. 303, 515 F.2d 1274, *cert. denied*, 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975), involving the Watergate incident and defendant Dwight Chapin. Defendants contend that the view of the court in *Chapin* has been rejected by this circuit and is contrary to the ABA Standards for Criminal Justice, *Fair Trial and Free Press* § 3.2(d) (1968). The court in *Chapin* held that the nature of the case and the pretrial publicity did not necessitate a change of venue.

The court began by citing *Jones v. Gasch*, 131 U.S.App.D.C. 254, 404 F.2d 1231 (1967), *cert. denied*, 390 U.S. 1029, 88 S.Ct. 1414, 20 L.Ed.2d 286 (1968), which held that the proper occasion to determine change of venue is voir dire. It then noted that the ABA Standards require the motion to be disposed of prior to voir dire. The court stated:

We are not ready to find that the logic of the *Jones* case should be put aside, as a routine matter, to conform to the ABA standards. Where community passions are high or publicity both localized and virulent, it might well be that a court would carefully consider whether the defendant should even be required to prepare for a trial before a predictably hostile jury, and not automatically hold off ruling on the motion until voir dire. However, we are also of the opinion that in this case, which does not present such a situation, the logic of *Jones* still holds. We note that no circuit has as yet adopted this part of the ABA Standards as routine. (515 F.2d at 1286, n. 7)

At this point it would be appropriate for the Court to discuss the ABA Standards upon which defendants rely in part in support of their motion. Section 3.2(c) of the Standards on *Fair Trial and Free Press* provides in part:

A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had.

Section 3.2(d) states in part:

If a motion for change of venue or continuance is made prior to the impaneling of the jury, the motion shall be disposed of before impaneling.

The Comments to Section 3.2(d) express the reasoning behind the Standard:

Subsection (d) deals with the relationship between a motion for continuance or change of venue and the process of jury selection. It has in many jurisdictions been common practice for denial of such a motion to be sustained if a jury meeting prevailing standards could be obtained. There are two principal difficulties with this approach. First, many existing standards of acceptability tolerate considerable knowledge of the case and even an opinion on the merits on the part of the prospective juror. And even under a more restrictive standard, there will remain the problem of obtaining accurate answers on *voir dire*—is the juror consciously or subconsciously harboring prejudice against the accused resulting from widespread news coverage in the community? Thus if change of venue or continuance are to be of value, they should not turn on the results of the *voir dire*; rather they should constitute independent remedies designed to assure fair trial when news coverage has raised substantial doubts about the effectiveness of the *voir dire* standing alone. The second difficulty is that when disposition of a motion for change of venue or

continuance turns on the results of the *voir dire,* defense counsel may be placed in an extremely difficult position. Knowing conditions in the community, he may be more inclined to accept a particular juror, even one who has expressed an opinion, than to take his chances with other, less desirable jurors who may be waiting in the wings. And yet to make an adequate record for appellate review, he must object as much as possible, and use up his peremptory challenges as well. This dilemma seems both unnecessary and undesirable. (Standards at 126–127)

The Standards approve of a method of dealing with motions for change of venue that would not permit the Court to await voir dire in order to determine actual prejudice. This approach is clearly not the law of the Fourth Circuit as that law has been expressed in many cases. In addition, the Standards are based on the assumption that voir dire is not a useful tool for exposing the conscious and subconscious prejudices of the potential jurors. The Court is not willing to accept this assumption and thus is not persuaded by the logic behind the Standards.[2]

In *United States v. Dioguardi,* 20 F.R.D. 33 (S.D.N.Y.1956), a case arising from an alleged acid-throwing attack on a newspaper columnist, the court denied a motion for change of venue, with leave to renew the motion at trial if it should appear that a fair and impartial jury could not be secured. The court concluded:

> In any event, to say at this point that it cannot be done [selecting an impartial jury] would be speculation and conjecture, devoid of conviction. . . . In this district the *voir dire* is meticulously handled by the judge presiding at the trial, and in his hands it is a sensitive instrument. Before granting a change of venue, it seems to me that it ought to be determined upon the *voir dire* that an impartial jury cannot be empaneled. Even the gravest apprehension may prove to be unwarranted. (20 F.R.D. at 35, 36)

In *United States v. Kahaner,* 204 F.Supp. 921 (S.D.N.Y.1962), *aff'd on other grounds,* 317 F.2d 459 (2d Cir. 1963), the court held that it could not consider a motion for continuance until voir dire had been conducted, reasoning as follows:

> It would be naive indeed not to recognize . . . that the publicity surrounding the case both before and immediately following the return of the indictment underscores the court's duty to question jurors on the voir dire with painstaking care to assure the defendants an impartial jury and a fair trial. The courts do not function in a vacuum and jurors are not required to be totally ignorant of what goes on about them. We live in a world of reality. Serious accusations against public officers and public figures are bound to receive wide publicity through all avenues of modern communication; the public interest will be more than casual and it would be rare to find persons qualified to serve as jurors who have not heard or read of such matters. These are facts that cannot be downed. On the other hand, it is also a fact that frequently in this large metropolitan district prospective jurors show little recall of past widely publicized matters; fears that jurors have formed opinions often prove groundless; the impact of news items upon the public mind, depending upon their nature, may be more imaginary than real. Further, impressions or even an opinion do not necessarily establish partiality or prejudice. That a case has been the subject of extensive publication or even comment does not, in and of itself, require automatic continuance of a trial; if that were the rule it would mean that, unless the press voluntarily refrained from continuing publicity, cases involving public officers or public figures could never be brought to trial. The fundamental question remains no matter what the trial date—can a fair and impartial jury be obtained which will decide the issues in the case solely upon the evidence presented in the courtroom?

---

2. *See* pages 1075–1076, *infra,* for further discussion of the efficacy of voir dire.

Whether or not the publicity has been of such a nature that the selection of a fair and impartial jury is foreclosed at this time cannot be determined until jurors are questioned on the voir dire. (204 F.Supp. at 924)

*See also United States v. Kline,* 205 F.Supp. 637 (D.Minn.1962), a prosecution for mail fraud against seven defendants, including the Mayor of Minneapolis, in which the court held that the defendants were not entitled to have the case transferred until voir dire, and *United States v. McNally,* 485 F.2d 398 (8th Cir. 1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974), a prosecution for air piracy in which the defendant, who had parachuted out of one plane, was convicted of hijacking two aircraft. The court there held that the district court properly awaited voir dire before ruling on the venue motion.

Defendants rely on the case of *United States v. Marcello,* 280 F.Supp. 510 (E.D.La. 1968), *aff'd,* 423 F.2d 993 (5th Cir.), *cert. denied,* 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970), in which the court discussed the timing of ruling on a change of venue motion. The court stated:

> Thus, by the very terms of the rule, venue may be changed *whenever* the court is 'satisfied,' whether this be at some time prior to the *voir dire,* at the *voir dire,* or at the trial itself. (280 F.Supp. at 514)

The court went on to note that voir dire is not the only time to make the determination of prejudice, although in many cases the court will not be satisfied that the requisite prejudice exists for change of venue until voir dire.

*Marcello* does not stand for the proposition that a court *must* rule on a change of venue before voir dire. Rather, the court in *Marcello* held that the court *need* not await voir dire if it were satisfied of prejudice before that time, a proposition which also seems to be accepted by the Fourth Circuit.

Defendants contend that one case very much on point is *United States v. Baggett and Rocks,* Criminal No. 28958–H (D.Md. 1971), before Judge Harvey of this Court. In that case, the case of defendant Rocks

had been severed from that of his co-defendant Baggett for legal reasons unrelated to pretrial publicity. Following the severance, Baggett went to trial in this district and was convicted. The trial and conviction received extensive media coverage. The Court then granted a change of venue to Rocks without first resorting to voir dire, as his trial was scheduled to begin only a few weeks after the widespread dissemination of news reports of his co-defendant's conviction.

The Court does not agree that *Baggett* is directly applicable to this case. In *Baggett,* there was a severance and the conviction of a co-defendant, circumstances far more compelling than those presented in the instant case. The government noted at oral argument that if the *Baggett* circumstances were present here, it would probably not resist a motion for change of venue.

From a review of the above cases, the Court concludes that it can determine defendants' motion for change of venue at this point, one month prior to the trial, only if the publicity surrounding the case rises to the level of being "inherently prejudicial." If the publicity is not of the inherently prejudicial quality, then the Court must deny defendants' motion and grant defendants leave to renew their motion upon completion of voir dire. It is, therefore, necessary for the Court to turn to an examination of the publicity surrounding the instant defendants.

### C. *The Publicity*

After reviewing the newspaper clippings presented by the defendants, the Court is of the opinion that the publicity surrounding the instant defendants is not of such a quality that it can be considered "inherently prejudicial." Therefore, the Court must at this time deny defendants' motion for a change of venue with leave to renew that motion upon completion of voir dire. The Court will review immediately below the factors that led to this conclusion.

The Court begins with the premise that a juror need not be uninformed in order to

serve fairly. The Supreme Court in *Irvin v. Dowd, supra,* stated in this regard:

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (366 U.S. at 722–723, 81 S.Ct. at 1642, 6 L.Ed.2d at 756)

The court in *Calley v. Callaway, supra,* also noted the possible consequences of requiring that a potential juror be shielded from all publicity:

The district court's conclusion that mere exposure to publicity necessarily prevented any person from serving as a juror has an extremely unsettling sidelight. If, in this age of instant, mass communication, we were to automatically disqualify persons who have heard about an alleged crime from serving as a juror, the inevitable result would be that truly heinous or notorious acts will go unpunished. The law does not prohibit the informed citizen from participating in the affairs of justice. In prominent cases of national concern, we cannot allow widespread publicity concerning these matters to paralyze our system of justice. (519 F.2d at 210)

■ It is not *all* publicity that causes prejudice to a defendant but only that publicity that operates to deprive defendant of a fair trial. Such publicity is of the type that proclaims the defendant's guilt in advance of trial and prejudices the minds of the public against the defendant to such an extent that most people are unable to weigh the evidence objectively.

Because the press naturally would be interested in a case of this nature, involving a Governor and his associates, the Court must be careful to distinguish between that publicity which is, on the whole, objective and factual and that which is unfairly slanted against the defendants. A court cannot hold that publicity of the objective and factual type operates to deprive a defendant of a fair trial. Potential jurors cannot be expected to be totally ignorant of the circumstances surrounding a case of this nature. Nor does the law expect jurors to be ignorant; the law seeks jurors who can be impartial, even if they have some knowledge about the case.

The first factor the Court would note is the nature of the offense with which the defendants are charged. In the Court's view, the subject matter of the instant indictment is less likely to cause strong press or public outcry against the defendants than a more "sensational" type of alleged offense. For example, the alleged murder of six people by the defendant in *Irvin v. Dowd, supra,* is the type of crime that, in most circumstances, generates strong public reaction against a defendant. It is true, as defendants contend, that some members of the public feel angered by allegations that elected officials have abused the public trust; but this anger is not of the same intensity as that caused by murder. It may also be true that citizens of this state, familiar as they are with charges of political corruption, have become "jaded" and do not have strong reactions to such charges. In addition, there are many members of the public who stand behind those they have elected and feel sympathetic toward them, a feeling rarely felt toward an alleged murderer.

■ The Court further notes that most of the publicity in this case has been centered around defendant Mandel, the Governor of Maryland, and not around his associates. This being the case, the Court feels confident that the public has not concen-

trated its attention on defendants Hess, William Rodgers and Harry Rodgers. Any danger that opinions about defendant Mandel will "spill over" onto the other defendants can be eliminated through proper voir dire and through cautionary instructions during the course of the trial.

Of great importance is the fact that the press has not presented a one-sided view of the charges in the indictment. Governor Mandel has had the opportunity, and taken advantage of that opportunity, to proclaim his innocence and to accuse the government of improper conduct in bringing the charges against him. The Governor's actions have been duly reported in the press. A recent development is the reporting of the efforts of some people to organize a legal defense fund for the Governor, a fact which demonstrates that the public is not determined to find him guilty.

It is true that the Governor has not moved for a change of venue and that many of the Court's comments above deal with publicity surrounding the Governor and not that surrounding the three defendants who have moved for change of venue. However, the Court again notes that most of the publicity and the public attention is focused on the Governor and not on the other five defendants. In *United States v. Barrett,* 505 F.2d 1091 (7th Cir. 1975), the defendant, a former county clerk for Cook County, Illinois, was found guilty of mail fraud, interstate travel in aid of racketeering enterprises and attempting to evade income taxes, and he appealed, complaining in part of prejudicial publicity. The court stated:

> That the public attitude toward general political corruption may appear to be more severe at one time than another does not justify a moratorium on the prosecution of crimes by political figures, absent pervasive prejudicial publicity and failure to screen prospective jurors. Here the pre-trial publicity was not extremely pervasive, much of it was directed to political figures other than the defendant and that concerning the defendant did not go beyond reciting the

charges of the indictment. Most importantly, each prospective juror was carefully screened to expose any possible prejudice. The district court was correct in denying the motion for continuance. (505 F.2d at 1099)

The timing of the publicity is another important factor. Defendants' newspaper clippings begin in August 1973 and continue to the end of March 1976. It is only that publicity which is contemporary to the instant indictment which is relevant to the Court's determination. As the Fourth Circuit noted in *Wansley v. Slayton, supra:*

> The recency of prejudicial publicity is important in determining whether such publicity is likely to affect an accused's right to a fair trial. Obviously, where considerable time has elapsed since publication, the probability or likelihood of impact is appreciably lessened. This has been recognized in the construction given Rule 21(a) . . . . To warrant a change of venue under this rule, the publicity must have been 'recent, widespread and highly damaging to the defendants.' (487 F.2d at 93)

Much of the early publicity involved matters not related to the instant indictment and is so removed in time from the indictment of November 1975 that is unlikely that the public remembers it. Nor is that publicity one-sided against the defendants. In fact, much of it involves other political figures such as the then Vice-President of the United States, Spiro Agnew, and County Executive Dale Anderson.

For these reasons, the Court has concentrated its attention on that publicity surrounding the indictment and post-indictment phases of the case. Since the indictment was filed, the publicity has been especially restrained, objective, and factual. As the court stated in *Calley v. Callaway, supra:*

> Also ignored by the lower court was the fact that a good deal of the extensive publicity surrounding the incident did not contain virulent and oppressive attacks on Calley, but rather objective statements of the facts known and discovered

about the My Lai incident or the more general topic of the conduct of the war in Vietnam. A prejudicial publicity claim must be viewed differently when the news accounts complained of are 'straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness.' (519 F.2d at 206)

The press has simply reported the contents of the indictment and of the subsequently-filed pretrial motions. There has been no attempt to characterize the defendants as guilty in any way of the crimes alleged. Further, this is not a case where the public has been regaled with such damaging matter as confessions or prior records as was the situation in *Irvin v. Dowd, supra.*

Defendants contend that there has been prejudicial publicity involving at least ten areas not related to the instant indictment, such as alleged illegal federal campaign contributions, tax investigations, a state investigation into portable classrooms, etc. The Court is not convinced from the clippings presented that the publicity in these other areas has been so extensive and so accusatory of the defendants that it has unquestionably prejudiced the public's opinion of the defendants and would deprive them of their right to a fair trial. In addition, the Court feels confident that any problems defendants perceive from publicity relating to these ten areas can be resolved satisfactorily at the time of voir dire, if such inquiry is requested and appears necessary to insure an unbiased jury.

Defendants contend that the cumulative effect of the publicity has prejudiced the public to such an extent that a fair trial is impossible in this state. The Court cannot find, after reviewing the publicity, that the cumulative effect is one of such vindictiveness against the defendants that selection of an impartial jury is effectively foreclosed. In the absence of such an effect, the Court must await voir dire before ascertaining the extent of any prejudice among the potential jurors.

█ Relevant also to the Court's determination is the question of whether a sub-

stantially more objective jury could be impaneled elsewhere. Defendants claim that publicity in the Western District of Virginia has not been as great as it is here. The Court notes, however, the transfer of this case to another city could generate extensive publicity in that city, perhaps making it impossible for defendants to obtain a fair trial there. The court in *United States v. Chapin, supra,* noted this consideration in denying a motion for change of venue:

In addition, firm precedent demands that the court take into account whether the publicity is sufficiently localized that potential jurors in another area would be free of any taint from exposure to the press, enabling the change to serve its purpose. . . . In considering this aspect of the motion, several courts have suggested that a venue change is usually more effective if it is to a more, rather than less, metropolitan community because a big case in a small town quickly becomes a *cause celebre* and the focus for substantially more publicity than existed at the time the decision to transfer was made. . . . (515 F.2d at 1288)

█ The Court must also consider the inconvenience to the government and the administration of justice of a change of venue. Defendants contend that, since the case will not involve many witnesses, it would not be inconvenient to move the case to Roanoke. However, defendants neglect to consider the difficulties involved in moving the Court and all of the personnel from Baltimore to Roanoke for the length of time it may take to try this case. Nor do the defendants consider the burden on the Court of trying the same complicated case twice. It is true that inconvenience to the Court is not a significant factor if it is clear that defendants' rights to a fair trial would be violated if a change of venue were not granted. However, this fact is not clear at this early stage of the proceedings, and therefore the Court considers it relevant to note the administrative burdens that would result from a change of venue for three of the six defendants.

In summarizing the nature of the publicity involved, the Court has evaluated the totality of the surrounding facts and finds that, at this early stage, it would be purely speculative for the Court to conclude that an impartial jury could not be impaneled in the instant case. This conclusion, as the Court has stated several times, must await voir dire. Prominence does not automatically bring prejudice, and the question of whether or not actual prejudice exists can be answered only by the potential jurors themselves. Only those jurors can state whether they read the newspaper reports and whether they were prejudiced against the defendants by those reports to such an extent that they could not listen objectively to the evidence presented.

 Before turning to defendants' remaining contentions, the Court notes that defendants argue that voir dire could be an effective instrument in some situations but that it would not be effective in this particular case since the jurors might have subconscious prejudices that they would not admit to or recognize. As the Court stated when considering the ABA Standards, *supra*, the Court cannot accept defendants' assumption that jurors in this case would hold subconscious prejudices that would render voir dire a useless tool. This Court's experience has been that jurors take their duty very seriously and are quite candid with the Court. The Court cannot harbor doubts about possible subconscious prejudices jurors might have unless our system of justice is ready and willing to abandon voir dire altogether. Such a drastic step has not yet proved necessary. Until it does, the Court will continue to view voir dire as an effective device in ruling on a motion for change of venue under the instant circumstances.

## II. Jurors as "Victims"

Defendants advance the novel contention that, because the indictment accuses the defendants of engaging in a corrupt scheme to defraud the citizens of the State of Maryland, the defendants, if tried in Maryland, will be tried before a jury composed of the victims of their alleged wrongdoing. Although the Court appreciates the ingenious nature of this argument, it is not persuaded by its substance.

As authority for this proposition, defendants cite the provision of ALI Code of Criminal Procedure (1931), Section 277 which deals with a relative of the victim serving as a juror. That section provides in part:

A challenge for cause to an individual juror may be made only on the ground: (i) That the juror is related by blood or marriage within the fourth degree to the defendant or to the person alleged to be injured by the offense charged or on whose complaint the prosecution was instituted.

Defendants also cite ABA Standards for Criminal Justice, *Trial by Jury* 68–69, following § 2.5 (Approved Draft, 1968). These pages of the ABA Standards simply quote Section 277 of the ALI Code in its entirety.

The Court is not convinced that the broad standards provided in the ALI Code are applicable to the instant situation. The drafters of the Code clearly did not have in mind a situation in which every resident of a state would be disqualified from serving on a jury in this type of prosecution. Because the drafters did not specifically consider the instant type of situation or one closely related to it, the Court cannot accept Section 277(i) as determinative.

Defendants also cite *United States v. Rossiter*, 25 F.R.D. 258 (D.P.R.1960), in which the court held that the defendants were entitled to have the proceedings in a mail fraud prosecution transferred from Puerto Rico to the District of Columbia on the ground that they could not obtain a fair and impartial trial in Puerto Rico. However, in that case, defendants contended that the alleged offenses were charged as being committed in the District of Columbia as well as in Puerto Rico so the case should be transferred to the District. Clearly, if the offenses took place in the District as well as in Puerto Rico, transfer to the Dis-

trict would not remove the problem of "trial by victims."

Defendants also direct the Court's attention to the cases concerning challenges for implied bias involving the qualifications of taxpayers to sit as jurors in cases where their community is a litigant. *See Annot.,* 81 A.L.R.2d 708 (1962). The Court has reviewed this Annotation and the cases cited therein and finds that there is differing authority among the states as to whether a taxpayer should be disqualified or not, with the majority of the cases holding that he should not be.

The view upholding the disqualification is based on English common law, by which the inhabitants of a municipality, or the members of any body politic, were incompetent to sit as jurors in a case in which the corporation was a party. The reason for this rule is the assumption that persons of the status in question cannot fulfill the requirement that jurors be absolutely unbiased.

On the other hand, the majority view is that a resident or taxpayer of a county or municipality is not disqualified as a juror in a case in which the county or municipality is a party or pecuniarily interested. The rationale behind these decisions is as follows:

> In support of the view upholding competency, it has been observed that the doctrine that jurors should not be interested in a controversy which they are called on to settle is founded on familiar principles of justice, but there are, in this respect, some kinds of interest which are too minute and too remote to be regarded, since every citizen is interested in the enforcement of law, and if that interest disqualified him from sitting as a juror or otherwise participating in a trial, no criminal could be punished; and from the necessity of the case, the integrity and sense of justice which most men possess must be trusted so far as to believe that they will not be improperly influenced by an interest of this kind which they have in common with the whole community. (*Annot.* at 716)

The case of *Bassett v. Governor*, 11 Ga. 207 (1852), is noted in the Annotation as follows:

> . . . the court in *Bassett v. Governor* (1852) 11 Ga. 207, an action against a county tax collector and his securities for county taxes collected by him and not paid over, upheld the competency as jurors of the citizens of the county, on the ground of necessity, saying that otherwise there would be no remedy, and the administration of the law would fail. The court went on to say that it was obvious that the interest of the jury in the case at hand was slight, remote, and uncertain, and that the presumption of bias growing out of it was extremely weak, scarcely greater in fact than that which any citizen has in good and effective government, or in the general administration of justice, and no greater than that which jurors have in the trial of criminal offenses any portion of the penalty for which goes to the county. (Annot. at 716–717).

The Annotation goes on to consider the general rule in criminal cases, noting:

> As a general rule the competency, as jurors, of the inhabitants and taxpayers of a municipal corporation or county which is litigating or is pecuniarily interested in the outcome of a criminal prosecution, or which is the place of the crime itself, has been upheld. (*Id.* at 725).

The Court further notes that it was held recently in *Ridglea, Inc. v. United School District No. 305*, 206 Kan. 111, 476 P.2d 601 (1970), a condemnation action involving a school district, that the taxpayers of the district were not absolutely disqualified from serving as jurors. But, the court held, whether their interest as taxpayers would impair their ability to act fairly and impartially was a proper subject of inquiry in voir dire examination. *See also School District No. 1 of Silver Bow County v. Globe & Republic Ins. Co.,* 142 Mont. 220, 383 P.2d 482 (1963), holding that taxpayers of a school district were not disqualified *per se* as jurors in an action by the district against

the insurance company for loss by fire of a school building.

The determination of whether a juror is biased or not in a particular case is a question of degree. At some point the Court must be able to assume that the juror's connection with the action will not constitute a *per se* bar to his serving in the case. If this were not so, then a situation could arise in which no person would be able to serve as a juror. Thus, for example, all officials with state-wide duties would be immune from prosecution under state statutes for violation of their public trust. Similarly, officials with a national constituency would be immune from any such prosecution under federal statutes. Another logical consequence of the argument would be emasculation of all criminal statutes expressly prohibiting particular conduct directed against the entirety of a legislating jurisdiction. Thus, for example, acceptance of the argument would ensure an end to prosecutions for conspiracy to defraud the United States, 18 U.S.C. § 371, and for treason, 18 U.S.C. § 2381 *et seq.*

In addition, prosecutions similar to the instant one have been presented before juries composed of citizens of the state, which citizens the defendants were alleged to have defrauded. *See United States v. Keane,* 522 F.2d 534 (7th Cir. 1975), *cert. denied,* 425 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746, 44 U.S.L.W. 3527 (1976); *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).

In *United States v. Russo,* 480 F.2d 1228 (6th Cir. 1973), *cert. denied,* 414 U.S. 1157, 94 S.Ct. 915, 39 L.Ed.2d 109 (1974), cited by the government in support of its position, a doctor was charged under the mail fraud statute with a scheme to defraud Blue Shield. The defendant sought to have all members of the venire panel who were subscribers to Blue Shield disqualified for cause. The court held that appellant was not entitled to have every subscriber disqualified since the answers of the panel on voir dire indicated that their subscription

would not prejudice them in any way. (480 F.2d at 1244)

■■ After reviewing the authorities and arguments presented by the parties, the Court concludes that citizens of Maryland are not *per se* disqualified to serve as jurors in the instant prosecution. The proper method for determining the extent of bias that might exist is voir dire. At that point, defendants can determine whether or not any of the potential jurors feel that they have been victimized to the extent that they could not sit fairly in the case. Thus, defendants' contention that all citizens of Maryland should be excluded as jurors is not sufficient, in the Court's view, to entitle them to change of venue prior to voir dire.

### III. *Additional Considerations*

Defendants conclude their memorandum by contending that three additional considerations support their motion for change of venue. They contend that prospective jurors will have preconceived attitudes with respect to defendant Mandel which will affect the action of the jury with respect to movants. Similarly, they contend that prospective jurors will have pronounced feelings regarding certain public officials who may be called as witnesses. Finally, they contend that many prospective jurors will have had business dealings with one or more of the defendants.

■■ As the Court has previously stated, careful examination of prospective jurors on voir dire serves to eliminate any possible jury bias. This is true whether the bias results from strong feelings about Mandel or about other public officials or whether it results from business dealings with the defendants. Thus, the Court holds that these additional considerations are not so compelling as to move the Court to deviate from its ruling that defendants must await voir dire before the necessity for change of venue can be determined.

### IV. *Conclusion*

The Court holds that the motion of defendants W. Dale Hess, Harry W. Rodgers, III and William A. Rodgers for change of

venue pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure must be denied. This denial is without prejudice, however, so that defendants may renew this motion at the time of voir dire if they so desire.

Accordingly, it is this 5th day of April, 1976, by the United States District Court for the District of Maryland,

ORDERED:

That the motion for change of venue filed by W. Dale Hess, Harry W. Rodgers, III and William A. Rodgers be, and the same hereby is, *Denied Without Prejudice*, to enable defendants to renew this motion at the time of voir dire if they so desire.